**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS**

WILLIAM YEAGER
P.O. Box 42 Cottonwood
Falls, Kansas 66845
———————————————

PLAINTIFF.

V.

NPR
NATIONAL PUBLIC RADIO
1111 North Capitol Street, NE,
Washington, DC 20002

ANDREW FLANAGAN
1111 North Capitol Street, NE,
Washington, DC 20002

JACOB GANZ
1111 North Capitol Street, NE,
Washington, DC 20002

ASHLEY MESSENGER
1111 North Capitol Street, NE,
Washington, DC 20002
———————————————

DEFENDANTS.

# COMPLAINT
# JURY TRIAL DEMANDED

**CIVIL CASE NO.**   18-4019-SAC-KGS
—————————

Plaintiff William Yeager in support of his Complaint against Defendants: NPR National Public Radio, journalist Andrew Flanagan, journalist Jacob Ganz, and NPR legal advisor Ashley Messenger, collectively, known and addressed as "Defendants," unless otherwise stated states the following:

CAUSE OF ACTION NATURE OF THE CASE

1. This action by William Conrad Yeager, known as Plaintiff, arises out of the publication of

numerous unverified, unsubstantiated, false, and defamatory statements that were written by

journalist Andrew Flanagan and published by NPR (National Public Radio) on March 24, 2017.

Plaintiff will not only provide factual evidence and testimony (from many people who will testify

in court) that will prove beyond any doubt the falsity of the statements, but will demonstrate with

clarity and certainty that the statements were written with extreme bias against Plaintiff,

negligence, exercising reckless disregard for the truth, and with malice. Plaintiff seeks retribution

against Defendants that have destroyed his reputation and terminated his career as an artist and

humanitarian.


2. Action also arises from NPR's defamatory statement announced on the airwaves (referred to

herein as: Radio Broadcast), on the program "All Things Considered," stating that Plaintiff was a

charlatan and a huckster to an audience of millions of people across the world. NPR serves an

audience of more than 36.6 million listeners each week via more than 1000 noncommercial,

independently operated radio stations, licensed to more than 260 NPR Members and numerous

other NPR-affiliated entities. NPR's website states that: "All Things Considered is one of the most

widely listened-to radio programs in the country." The immense humiliation, pain, anxiety, and

grief that Plaintiff has had to endure because of these statements are deplorable. This lawsuit

alleges as follows:

3. On March 24, 2017 4:31 PM ET NPR reporter Jacob Ganz stated on "All Things Considered" radio show (transcribed from NPR's website): "He's a huckster. He's a charlatan." These statements were made regarding the Plaintiff, who is an artist, musician, filmmaker, performance artist, activist and humanitarian. Merriam-Webster's description of a "Charlatan" is: a quack, sham, fraud, fake, impostor, hoaxer, cheat, deceiver, double-dealer, swindler, fraudster, mountebank. Merriam-Webster's dictionary description of a "Huckster" is: hawker, peddler; especially : one who sells or advertises something in an aggressive, dishonest way. These descriptions are serious allegations, and more befitting for an embezzler and felony criminal, one that has been proven guilty of serious crimes.

4. The NPR story (referred to herein as: The Article) written by journalist Andrew Flanagan, contains numerous fabricated and libelous statements about the artist William (Billy) Yeager, stating that the Plaintiff has repeatedly invested more energy in being a trickster (a person who cheats or deceives people; cheat; fraud; villain; scoundrel, shyster) rather than as an artist (musician and filmmaker). This cynical, sensational defamatory Article, also misled readers into perceiving Plaintiff as a complete failure and an insane character. NPR's story incited outrage and sent readers into a hate-frenzy; readers posted shocking comments of scorn stating that the Plaintiff was a "scammer, fraud, paranoiac, schizophrenic crook, con artist, trailer park trash, and sell out."

5. NPR published (and republished), without any verification, false information that stated and depicted the Plaintiff as an embittered musician who had been tersely rejected by the music and film industries; one who invested his energy on being a trickster because he was obsessed with fame and infamy. Defendants purposely avoided mentioning information that they knew proved otherwise such as facts that proved the Plaintiff has a profound purpose and meaning in his work as an artist, musician and filmmaker, and in his life as a human being, activist and humanitarian. Defendants knew the meaning and purpose of Plaintiff's work was to change the world for the better of humanity, and to raise conscious awareness about serious issues regarding the injustice and the suffering in the world. Defendants chose to exercise reckless disregard for the truth, and acted with contempt, derision and hostility toward Plaintiff, while well aware of the damage they would inflict on Plaintiff, and the fact that they would destroy his reputation, which clearly shows malice. The Article was republished around the world, including Japan, Europe, and Australia; it was reposted by other 3rd party websites and shared on-line; it was also shared on social media on Twitter, and Facebook. NPR, in fact, posted it several times on their Facebook page.

6. 6 months later, on September 6, 2017, another journalist, Leah Friedman from the news source called OMG News, read NPR's defamatory Article and immediately detected bias. Leah Friedman also perceived the Article was written with malice, and by a journalist with an agenda. Plaintiff is known as a musician, filmmaker, performance artist, activist and humanitarian. There was detailed information about the Plaintiff on the internet and on his official website: www.billyyeager.com, including bio, awards won, music videos, films produced, and music

recordings. There are also 2 documentary feature films that have been produced about Plaintiff's life; one of them called "The Film That Changed The World" won 'Most Inspirational Movie Award' in 2015.

7. Leah Friedman's moral imperatives revealed a rare breed of an ethical journalist, one that was willing to invest the appropriate amount of time that is crucial in regards to "discovery of the truth." Leah wrote:

    a. "The first thing to know is that I write many articles about many different topics. After doing this for awhile, the dots start to connect. That's what happened when I came across this article. I already knew the media is biased, so I scrutinized the accusations knowing there was bias behind them. I set out to understand what happened. So my research began.
    From what I understand about Billy Yeager's goal and the controversy it provokes, it stands to reason that anyone he disagrees with will try to discredit his work, his opinions, his convictions, talents, etc., especially if they know he is right. Any recognition on their part will mean they have to admit their wrongdoings and give credit where credit is due.

    b. The Yeagers are trying to make music from their souls. Additionally, they are trying to present through films and other outlets a truth they believe deeply. These truths are against the agenda of the powers that be. Consequently, they try to discredit and ban the Yeagers from any success due them. The Yeagers are an example of people pursuing their purpose. That is a mission we all have. Some live up to it, but many don't. I KNOW the media is controlled and manipulates in so many ways and directions. The agenda of the media is to

brainwash people."  Leah Friedman

8. How does one journalist perceive that "The Yeagers are an example of people pursuing their purpose," and Andrew Flanagan (NPR) states that "Billy Yeager's life story is one of purposeless obfuscation." Based on these two statements above, Plaintiff is an artist on a humanitarian mission, yet conversely, he is a fraud and a charlatan according to NPR.

9. When NPR was launched in 1971, the network made clear its commitment to excellence, stating it would "provide listeners with an aural esthetic experience which enriches and gives meaning to the human spirit." NPR's mission statement today states: "NPR reports, produces, acquires and distributes news, information and other content that meet the highest standards of public service in journalism and cultural expression." Below are a few examples of NPR's hypocritical "high commitment to excellence" that "enriches and gives meaning to the human spirit." Below are few of the defamatory descriptions of Plaintiff, and direct quotes, that were published in The Article; they are as follows:

a.  "Its motivating force was a hunger for fame, or infamy" - "to pull off the scam" - "Yeager has been stymied repeatedly" -  "It was the closest he would come to fame" - "living in a cramped beach apartment … with a drawer jammed with hundreds of terse rejection letters" - "embittered Yeager began to plan the Jimmy Story bamboozle" - "a tumble down the rabbit hole of Yeager's life is quixotic indeed - relentless failures and his ceaseless drive to reverse them" - "Yeager, for all the belief he has in his promise and his failures expressing it, has repeatedly poured more of his creative energy into being a

trickster-booster than he has an artist" - "the story of Billy Yeager is one of purposeless obfuscation."

10. Each one of these statements above (and many others in the Article) are extremely defamatory; Plaintiff repudiates these defamatory, stagily and maliciously written chimerical claims which destroyed Plaintiff's reputation and caused him severe emotional distress. Evidence provided herein, proves and attests to the truth and character of Plaintiff who has in fact invested over 40 years creating art, music, and films that "enrich and give meaning to the human spirit." This "aural esthetic experience" (1971 NPR commitment to excellence) is in fact experienced in Plaintiff's work as a filmmaker, musician, activist and humanitarian, who provides his work to the public. However, because of NPR's Article and Radio Broadcast, public concluded that Yeager was a fraud, a scammer, talentless, purposeless, a loser, a failure, embittered, crazy, obsessed with attention and infamy; public's perception is proven by comments to NPR's Article; Plaintiff was even compared to Charles Manson: "way too many similarities to Charles Manson who thought he was a soon to be rock star."

11. FACT

Below are some quotes that have been written and published about the Plaintiff. These descriptions of Plaintiff's work and mission are accurate :

a. "Glitter and obscene excess, side by side with unspeakable suffering brought down on a dying world; this is what I see in the films and videos that the

Yeagers fearlessly continue to produce in the face of a hostile political and commercial network, which apparently thinks nothing of using a hastily constructed and poorly documented non-story to bring them down. This type of story brings the haters and trolls out of the woodwork too, and reading the comments to both stories was nauseating." Dan Mage (NOTE: The above was written after NPR's defamatory Article was published.)

b. "In 2005 artists husband and wife team Billy and Anais Yeager, each abandoning mainstream careers to create a "transcendental film" that will help raise human consciousness and awareness and "change the world", embarked on their artistic endeavour that would see them sell most of their possessions, travel the desert in America for three years and make their trilogy Jesus of Malibu all by themselves, alternating between the tasks of acting, filming, directing and composing.

c. Anais and Billy's stories too, are epic painful epiphanies transformed by the deep psychic connections that their bodies hold with the earth. With the desert as their canvas and witness to these personal, internal frontier breaking narratives, it is hard not to fall slightly in love with both of these sincere, thoughtful and spiritual activist artists. Yet we see that Billy and Anais remain outlaws in a monumental David and Goliath situation - we see how they are courted and then rejected by the mainstream media and its associated cultures." Verity Healey

d. "By no fault of his own, Yeager has found himself pushing his talent in a world that swats him away. The reason is that his views, do not go along with the mainstream. This simple but clearly damning fact has prevented him from being recognized and moving forward in a career he has earned merit. In a ridiculously corrupt media and music industry focused on the contribution

towards society's downfall and everything of true value, Yeager tries to remain
true to his talent and beliefs.

e. He presents startling rare and raw footage. The riveting contrast between real
life and the mortality of the human race, how we seek to destroy each other and
the false hiding of the self in an extremely shallow world. The world where
partying, sex, drugs, and everything celebrating physical luxury and comfort is
the modern way to avoid the true realities of all life all over the planet.

f. The culture protest is real, and the media does want to suppress all that
Yeager has produced and created with the talent and artistic abilities he
displays. Billy Yeager devastatingly understands this. His mission is to raise
this consciousness and help those who can not help themselves." Leah
Friedman NOTE: This was written after NPR's published Article.

Exhibit A. attests to the statements above. http://exhibitscase.blogspot.com/2018/03/
exhibit_52.html

12. Plaintiff's reputation was destroyed by the publicly funded NPR, which obliterated a 40 year
career overnight because of The Article and Radio Broadcast they published and broadcasted on
the public airwaves. One of NPR's original founders Bill Siemering stated: "National Public
Radio will serve the individual; it will promote personal growth; it will regard individual
differences with respect and joy rather than derision and hate; it will celebrate the human
experience as infinitely varied rather than vacuous and banal."

13. Founded on a deep well of ignorance and hostility towards the artist it purported to inform its readers about, the Article did not share any joy, promote personal growth, or serve the individual; the Article in fact did not include one truthful description about Plaintiff. Andrew Flanagan was able to successfully manipulate his readers into a hate-fiesta with his Article, leading the procession with prejudicial insolence towards Plaintiff. Evidence provided and correlational comments to the Article such as: "Great job exposing this fraud" "its a story about nothing more than a scam" "this guy is a con artist" "everything positive written about Billy Yeager is fake" will demonstrate what readers felt after reading NPR's defamatory Article, written with negligence, reckless disregard for the truth, and malice.

Exhibit B. http://exhibitscase.blogspot.com/2018/03/exhibit_76.html


14. Plaintiff's work as an artist, filmmaker, musician, activist and humanitarian, challenges the human spirit, to seek the divine knowledge that sometimes lies dormant, yet is still latent within our grabst. With great disdain and hubris, Defendants made their venomous attacks. Defendants' radio broadcast on "All Things Considered" was nothing more than an acrimonious prattling, slandering Plaintiff, with an apparent agenda. Relinquishing all of NPR's most cherished traditions and coat of arms - code of ethics, NPR's Jacob Ganz and Andrew Flanagan never allocated fair time on their broadcast to allow their "subject" (Plaintiff Billy Yeager) the chance to speak on his own behalf, to defend himself from these serious allegations, and prove his true character. Plaintiff will provide factual evidence and will prove beyond any doubt his true character, purpose and mission.

15. NPR states: "We honor our commitments to impartiality and fairness by presenting our audience with a variety of voices." There was no variety of voices, only biased, false and venomous statements presented as "facts" by 2 journalists with animosity toward Plaintiff; Defendant Jacob Ganz stated on "All Things Considered" that the Plaintiff "is far more interested in infamy than he is in fame and the chase of pulling the wool over people's eyes."

a. To be fastidious, proven idiom is not to be confused with idealogical jest idiom; "pulling the wool over people's eyes" is defined as "to deceive someone," "deception" is defined as "fraud," fraud cannot be misconstrued or misinterpreted when used in any condition or circumstance; these words, together with the description of "charlatan," would definitively be considered to be risky by any journalist; used haphazardly, they will lead to detrimental consequences, for they are in fact defamatory.

16. Andrew Flanagan and Jacob Ganz's aberrant conduct was a breach from NPR's own contract that is professed to its public listeners: "We make sure our guests and interview subjects know what we want to talk with them about. But we are especially careful with those who have not been interviewed many times by many media outlets." Flanagan published, and Jacob Ganz broadcasted on the Radio Broadcast, defamatory allegations about Plaintiff, knowing that scandal drives up and increases readership, and maximizes potential for more listeners, which consequently, and conveniently increases revenue, yielding profits for those who benefit from

such unscrupulous practices. NPR's Ethics Handbook and reputation were abused and debased;

Defendants never invited Plaintiff to be interviewed; Defendants were not careful; Jacob Ganz,

Andrew Flanagan and Audie Cornish ridiculed and mocked their subject.


17. Fact checking is a requisite for any journalist, even when covering the mundane, but more-so

before accusing a subject of serious allegations of fraud; mandatory this "fact checking" is in all

ethical publications and media outlets, and if discovered that a publication is faulty because of

blatant reckless disregard, then serious punishment is justifiable, all the more, when a non-public

person's reputation has been destroyed. Without regard to the innocent subjects of their stories,

whose careers are destroyed, Defendants refused to investigate and verify their facts, depicting

and labeling Plaintiff as a fraud; not one source who had worked with Plaintiff was obtained for

The Article; not a single person that had watched the documentary films about Plaintiff's life and

work was contacted, and Defendant Andrew Flanagan (a professional music journalist) refused to

watch a feature film documentary about the Plaintiff (someone Flanagan had never heard of)

which he was aware would reveal all the information about Plaintiffs' music, films, mission and

purpose.

Exhibit C http://exhibitscase.blogspot.com/2018/03/exhibit_29.html


18. Flanagan's only source (that knew Plaintiff) that he used and quoted for his story was a

musician named John Stacey, who had not seen or spoken to Plaintiff in over 17 years. Not

having been in contact with Plaintiff, John Stacey was unaware, ill-informed of what Plaintiff had

been creating as an artist for the past 17 years. Defendant Andrew Flanagan failed to ascertain the validity of the statements that were made by John Stacey; Defendant's motives and agenda are clearly apparent in how he used John Stacey's false statements and fabricated information for his story to distort the truth.

19. Despite the fact that the Plaintiff's Official Website stated that he was an award winning musician and filmmaker, a performance artist, an activist and a humanitarian; despite the fact that there was a 3-minute movie trailer and a feature film documentary which tells the story of Plaintiff's life; despite the fact there were 8 music videos, and a 7-minute promotional film trailer from an Award Winning documentary film that tells the story about Plaintiff and his wife and their desire to change the world (this film trailer features over 10 people speaking on Plaintiff's behalf), Andrew Flanagan made no mention of these facts, and did not write one single positive comment or forthright statement about the Plaintiff, his work or his mission; Defendant again refused to contact any people in the film trailer (several names are provided in the film trailer) or use any of the many positive comments being stated about Plaintiff.

Exhibit D. https://vimeo.com/153199300

20. This action against NPR is not the typical "defamation lawsuit"; it is not a simple case of the improper use of one or two defamatory words or statements; one of the most disturbing facts concerning this nefarious case addresses the journalistic ethics of Andrew Flanagan who not only

fabricated a story which was 100% completely biased against Plaintiff, but made the conscious

decision to use an exorbitant amount of sheer defamatory descriptions (over 41 descriptions); this

is petrifying, considering the fact that this journalist was hired by NPR, who claims that all of

their journalists strictly adhere to their code of ethics. Defendant's Article was nothing more than

a bumptious labyrinth of malicious statements and innuendos, completely unethical according to

NPR's code of ethics.

Plaintiff will provide factual evidence (and testimony from many people) and will prove beyond

any doubt Defendants' statements were defamatory, and that Defendants acted negligently, with

reckless disregard for the truth, and with malice.


21. One of Andrew Flanagan's agendas was to accumulate more readers, the type of readers who

like to read sensational stories, and are easily provoked by shock and negativity, and would share

and re-share his story on the internet, adding more followers to his social media account and

increasing readership to his NPR stories.


22. Andrew Flanagan chose over forty-one (41) definitive negative words to
describe his subject, the Plaintiff, such as: 1. hoax, 2. hunger for fame, 3. far
from success, 4. stymied repeatedly, 5. ill-conceived, 6. hoax (again), 7. scam, 8.
weirder, 9. hoax (again), 10. fake, 11. terse rejection, 12. embittered, 13.
bamboozle, 14. roughshod, 15. chaotic, 16. hoax (again), 17. quixotic, 18.
relentless failures, 19. owed greatness, 20. source of obsession, 21. minor, 22.
invention, 23. obfuscation, 24. self-mythology, 25. purported, 26. ostensible, 27.
murkier, 28. fictional, 29. dubious, 30. clearly fake (again), 31. purposeless, 32.

obfuscation, 33. failures, 34. those with ample time in their hands, 35.
compulsive, 36. artifice, 37. notoriety, 38. obsession, 39. infamy, 40. trickster,
41. booster.

23. Consider if the above descriptions could be interpreted as "damaging," consider also NPR's
handbook which is mandatory for all journalists to adhere by when covering any subject, and it
becomes clear this is a case of unethical journalism and defamation.

NPR HANDBOOK

a) special care with news that might cause grief or damage reputations.

b) Any falsehoods in our news reports can cause harm. But errors that may
damage reputations or bring about grief are especially dangerous, and extra
precautions should be taken to avoid them.

c) Accuracy is at the core of what we do. We do our best to ensure that
everything we report faithfully depicts reality – from the tiniest detail to the big-
picture context that helps put the news into perspective. Facts are incredibly
slippery. Studies of press accuracy routinely find mistakes – sometimes many of
them – in news media reports. This means that when journalists – even the best
ones – think they're getting it right, they're all too often wrong.

d) Errors are inevitable. But our best defense against them is constant vigilance.
This is why we systematically and rigorously review our facts before we make
our reporting public.

24. Plaintiff will provide factual evidence that will prove beyond any doubt that "vigilance for accuracy" was not executed, "falsehoods" about Plaintiff did cause "harm and damaged reputation," "extra precautions" were not taken when using "especially dangerous" words, and so called "facts" were not "rigorously" challenged. For lucid interpretation a sample as follows:

a) "The story of Billy Yeager is one of purposeless obfuscation" and "A tumble down the rabbit hole of Yeager's life is quixotic indeed- relentless failures and his ceaseless drive to reverse them form a closed loop that only occasionally reaches out into the real world."

25. Defendant states that Plaintiff's life is one with no purpose, but instead "obfuscation"; filled with relentless failures; a bizarre quixotic life that only occasionally reaches out into the real world; Defendant is making a mockery of his subject. NPR published more than 41 of these negative, derogatory, insulting, dangerous, defamatory descriptions about their subject; consider NPR's handbook "special care with news that might cause grief or damage reputations"; the lack of fact checking, negligence, bias and reckless disregard for the truth prove the malice in this case; there were articles, videos, factual information, available on Plaintiff's websites and on the internet, that proved that Plaintiff was an artist and a person with spiritual desires, one on a spiritual mission, wanting to use his talents to help change the world for the betterment of humanity. Defendant was also aware that Plaintiff was producing a benefit concert to collect funds to help land-mine victims. Defendant purposely refused to write or to publish this

information.

Exhibit D2: This story has been published since 2014. The story was posted on Plaintiff's website:

https://hubpages.com/entertainment/Jesus-of-Malibu-The-happy-accident

26. If one opens his eyes and his heart he will see that the "real world" is where there are 100's of millions of people that starve and suffer all across the world, where selfishness, greed and corruption abound, and where injustice still prevails. Desperate people pray and plead for the world to help them, yet their prayers sadly fall on deaf ears because of the endless trivial distractions that are bombarded upon humanity, by the entertainment industries and the media, one of the biggest perpetrator and perpetuator of this crime. There is child labor, children as young as 5 years old being sold into prostitution, there are the innocent people tortured in prison, there are the maimed, armless, legless, motherless, fatherless, helpless and hopeless that live on less than 50 cents a day, all the while we, the liberalized people who (according to our Founders) freely own and embrace "the pursuit of happiness," have been seduced and "entertained" into a superficial state of "happiness" by the media and the entertainment industry, that has turned us blessed people into selfish cynical fools, who think nothing more than their next meal and next selfie. Do we oh Great Nation that the world look upon, allow ourselves to condone this type of behavior? And when the voice of one calls out from the wilderness and cries, "Wake Up People to the ugly truth that surrounds you! Awaken to empathy and compassion you God forsaken people!" and this Public funded institution makes a conscious decision in a moment to destroy Plaintiff's work, which is considered a talent, not to be buried, but to be a lamp and light unto all, one that has been bestowed upon Plaintiff by the Creator, I declare to you Goliath you have met your David, and I slay your evil deeds with a two edge sword! In this Great Country all men shall always have the right to defend themselves, including pro-se. Welcome and blessed be to those who feel this "real world," may justice be served for Plaintiff and for All. May vengeance be mine.

a)  NPR states: "We take enormous pride in the craftsmanship of our storytelling
and in the quality of the words, sounds and images we use to help illuminate the
world."
Plaintiff's life has been devoted to spreading the message of truth, empathy and
compassion, with his art, music, films and activism.

b) NPR's Andrew Flanagan had an opportunity to "illuminate the world" when he
was assigned to write the story about Plaintiff. Instead Defendant chose to
defame Plaintiff and exercised reckless disregard for the truth; Defendant refused
to include or mention the music video titled "Wake Up People" which was the
most recent music video produced by Plaintiff (posted in Dec 2016 on Vimeo,
YouTube and on Plaintiff's websites.); the music video is a clear depiction of the
injustice and suffering that happens around the world, which clearly proves what
concerns Plaintiff as an activist and humanitarian.

Exhibit E.  http://exhibitscase.blogspot.com/2018/03/exhibit_28.html

27. NPR Published statement: "Yeager's life is quixotic indeed- relentless failures and his
ceaseless drive to reverse them."

a. If there be a "ceaseless drive," that ceaseless drive that has been instilled in Plaintiff by our
Creator, exists not for self (Plaintiff), but for our fellow man, for the one who suffers; that
ceaseless drive is what all humanity should experience - not as driven to or by success, but driven
by a relentless passion to action to become a beacon for the downtrodden, and to sound the
trumpet for those who cannot defend themselves; I do swear that I will become a voice, for those
who do not have a voice, and my duty to mankind on this earthbound body is to help reverse this

closed "loop," that does not open a window of chance and opportunity for the destitute of the world, and I will avenge with all righteous anger, to right the wrongs, to make the path straight; May it be on record this day, The story of Billy Yeager is one of DIVINE purpose, and may those who wait in silent prayer know I am here - I AM, and by God with my whole self I give my life, and my wife also, to defend those, and through our art, music and film we will change this world for the better of humanity, for today is the day of the Coming of Truth.

Exhibit: Pastor Tim Lytle http://exhibitscase.blogspot.com/2018/03/exhibit_74.html

28. If there be any "relentless failures," may this description to which the Plaintiff has been relegated to, be written on the tombstones of the 21st century lying, deceptive, cynical media outlets, that have no decency to write and publish virtuous meaningful stories for humanity to read and hear about; let it go on record for our future generations, that the media in these dark times was substantially responsible for the downfall of society, let it go on record that I was born to speak these words of truth, and let this be the day of the decree, Truth be Told: Revolution for the Freedom of the Mind.

29. Defendant Andrew Flanagan did not write one single positive statement about Plaintiff or Plaintiff's work on the Article published by NPR; it is clearly evident Andrew Flanagan did not want his readers to learn anything about Plaintiff's purposeful, meaningful, and inspirational story, work, music, films, performance art / activist protests, or charity causes.

30. Plaintiff has researched the facts and history about previous cases of defamation in the United States Courts, and it will be apparent to anyone, discovery proves that, this is an extremely serious case of defamation, negligence, reckless disregard for the truth and malice; a case where the complete story is biased against Plaintiff, a case where not one sentence that was written about the subject (Plaintiff) describes a "truthful fact" about the "character of the Plaintiff," his work or his mission.

31. To everyone in the past who has worked with Plaintiff or has witnessed Plaintiff's work, Plaintiff's message in his music and films provides inspiration, and challenges people to think and question mankind's perception about the "truths" that we are told, such as the "truths" that we are being told by the media itself. In his work Plaintiff addresses subjects such as fear and the power of love; All people are spirit, all are One, what we give, we receive, if we change ourselves, we can change the world; this can only happen however, if we remove all fear. Plaintiff has been aware for over 30 years that the media instills fear, by reporting and spreading outrage news, that create hatred, and division, and therefor the media is "fear itself."

32. The Plaintiff clearly addresses the negative aspects of "the media itself" in some of his work, therefore it can only be presumed there was an agenda by the media to tarnish Plaintiff.

33. Defendant Andrew Flanagan is a journalist who never spoke to his subject (Plaintiff Billy Yeager), a journalist who refused to watch a film documentary about the subject he was writing

about (whom he states: "No one has ever heard of him"), a journalist who refused to contact one single relevant source, such as people who had worked with subject for many years and knew him well, a journalist who not only acted with negligence but malice, exercising reckless disregard for the truth and depicting Plaintiff in extremely negative false light.

34. Defendant's Article, which incited extreme negative comments from readers, majorly contradicts what 100's of people will be willing to testify on Plaintiff's behalf.

False Light

a) Depicting character in a "false light"; Defendant's agenda was a "meticulously planned attempt to assassinate the character through bias, distortion and fabrication of false information, and blatant reckless disregard for the truth."

35. Plaintiff presents the legal term known as "false light," which can be used in the courts to protect a non-public person from the offense or embarrassment that arises from misleading or untrue information, which puts the person in a false light to the public. Only 3 states do not recognize and adhere the "false light" laws, they are New York, Florida and Texas.

Therefore in the State of Kansas Plaintiff presents this case.

36. Plaintiff will prove False light, proving the following elements:

  1.  The Defendant published some information about the Plaintiff.

  2.  The information portrayed the Plaintiff in a false or misleading light.

  3.  The information is highly offensive or embarrassing to a reasonable person of ordinary

  sensibilities.

  4.  The Defendant published the information with reckless disregard as to its offensiveness.


37. The statements published by NPR in The Article would be considered "highly offensive and

embarrassing" by "reasonable people of ordinary sensibilities." The comments people made about

Plaintiff after reading The Article published by NPR would be considered "highly offensive and

embarrassing" by "reasonable people of ordinary sensibilities."


38. Plaintiff states that NPR's actions were 100% contradictory to what NPR describes in their

Ethics Manual. Defendant manipulated their readers into believing that Plaintiff is nothing more

than a fraud and a failure, with no purpose in life other than seeking attention because he is

pathetically obsessed with obtaining fame and infamy. Plaintiff will not only present evidence that

proves Defendant's statements are false, but will provide testimony from many people who will

testify in court otherwise.


Below is one of these people.

Exhibit: https://vimeo.com/248196676

39. The films Plaintiff has produced and directed (several which have won awards) involve many

people from many professions, including, actors, musicians, producers, camera operators, sound

technicians, and film festival directors. Each one of Plaintiff's 5 feature films is listed on IMDB,

which is considered by the film industry to be one of the most trusted movie based resources on-

line. With strict rules and guidelines, all films listed on IMDB must be legit and verified by a

senior administrative staff member.

40. All films that are listed on IMDB must have been publicly screened; films must include credits

that are considered "professional" attached to the listing. It can take many weeks and even months

for an independent film to be listed on IMDB, therefore any professional journalist is well aware

of the legitimacy of a film that is listed on IMDB, and would therefore consider Plaintiff's 5

feature films to be professional, and that Plaintiff is by all accounts a professional film producer,

filmmaker, and film director. NPR and Andrew Flanagan in fact did mention IMDB in their story

(proof that Defendant saw this), yet refused to contact or quote a single reliable source that had

worked with Plaintiff. Defendant only referred to Plaintiff's films in a negative manner (consider

Defendant never watched any of the films himself), describing one of Plaintiffs films "Jimmy's

Story," which won 5 - awards as "roughshod and chaotic." "Jimmy's Story" won Best

Documentary at the Palm Beach International Film Festival; Heath McKnight awarded the film

stating: "An outstanding film that is a remarkable achievement, I can't imagine how much work

went into this very personal original film." Awards ceremony at The Palm Beach International

Film Festival.


Exhibit F. http://exhibitscase.blogspot.com/2018/03/exhibit_27.html


41. Some of the most detrimental statements made by NPR, which cannot be misinterpreted or

misconstrued in any manner are "The story of Billy Yeager is One of Purposeless Obfuscation"

and "Yeager has repeatedly poured more of his creative energy into being a trickster-booster than

he has an artist." Defendant refused to verify statements made by his only source who had not

seen Plaintiff in over 17 years; Defendant refused to watch the 1 hour and 40 min feature

documentary film about Plaintiff, even though Flanagan was well aware that the documentary had

samples of Plaintiff's work. Defendant visited Plaintiff's website where there were many positive

articles, music videos and film trailers. The articles could not be missed, they were clearly visible

and obvious; each described Plaintiff's "creative energies" and "purpose," each one tells a positive

inspiring story. The music videos and film trailers on the website also depict Plaintiff's mission,

there is no question, one only needs to listen to the positive comments stated by many people

testifying of Plaintiff's true mission and purpose in life. Malice is evident in abundance. Andrew

Flanagan, Jacob Ganz and NPR purposely refused to use or refer to any of these facts of evidence,

instead they chose to depict Plaintiff as nothing more than a pathetic psychopath, motivated by "a

hunger for fame and infamy," one with no direction, purpose or meaning in this life. The

documentary covers many topics about Plaintiff as an artist, musician, filmmaker, activist and

humanitarian.

42. One of the most important topics covered in the film documentary about Plaintiff is his dedication to songwriting. Plaintiff began writing songs since the age of 11; Plaintiff worked extremely hard to become a good songwriter, and was discovered in 1991 by the Grammy Award Winning songwriter Bruce Hornsby, who won Best New Artist of the year in 1985 for the hit song "That's Just The Way It Is," and "Mandolin Rain." NPR's statement: "Yeager has repeatedly poured more of his creative energy into being a trickster-booster than he has an artist" is not only a major contradiction, but an out right fabricated lie. How could it be possible, that a world renowned Grammy Award Winning singer-songwriter could take seriously and discover another singer-songwriter if the so called musician was investing all of his time and creative energy into being a trickster - booster. NPR's journalist, Andrew Flanagan's statement is beyond insulting, and has severely damaged Plaintiff's reputation as a real artist. These facts mentioned above were not only featured in the film documentary about Plaintiff, but are also explained on the Plaintiff's website (including pictures and articles). Defendant did in fact make mention of Bruce Hornsby, but dismissed it as nothing worth mentioning except that Hornsby provided a "source of obsession."

Exhibit G. http://exhibitscase.blogspot.com/2018/03/exhibit_86.html

43. After the story was published, NPR's legal council Ashley Messenger was contacted and

informed about the defamatory Article; Plaintiff requested that NPR remove The Article, to which

they refused.

44. Principle to this case is the refusal of Defendant to inform his readers about Plaintiff's

unrelenting desire to change the world for the better of humanity, something Defendant was well

aware of. Consider the malice of the Defendant, who refused to include any link or information

that showed Plaintiff's humanitarian side in his story, and instead included a link to someone

else's video which showed Defendant in his early 30s (Plaintiff is 60 years old) playing guitar at a

backyard party; when in fact there were several other videos on the Plaintiff's websites, and on

YouTube and Vimeo, that were not only up to date, but depicted what the Plaintiff had been

involved with for the last 15 years.

45. On the Plaintiff's website, including several other blogs online, there was an ample amount of

information about one of Plaintiff's most primary concerns, providing wheelchairs to victims of

land-mine explosions. Over 100 million people around the world still do not own a wheelchair. As

an artist, Plaintiff has never been interested in using his talents to simply entertain the public.

Exhibit H. http://exhibitscase.blogspot.com/2018/03/exhibit_6.html

46. Due to NPR's libelous and slanderous statements, the Yeagers' charity benefit concerts that

were going to be held at an underground missile base in Kansas, beginning in the fall of 2017,

were permanently terminated.  Also because of the defamatory statements and bad publicity, a

tour of the screening of the film documentary about Plaintiff called "The Film That Changed The

World" (which won Most Inspirational Movie Award in 2015) was canceled. Consider the

positive meaning behind the title of this film, consider the award it won: "Most Inspirational"

movie award; the word "Inspirational" would have indicated there was something inspirational

for a journalist to write about, yet this meant nothing to the Defendant, who refused to mention

anything about the film, even the title; it becomes obvious that this is a serious case that concerns

a journalist with impure motives, one with a biased agenda against Plaintiff.


47. The defamatory statements published and broadcasted about Plaintiff were not the result of a

simple mistake, but was a deliberate decision, made by a media outlet that was more concerned

with publishing their sensational story first (9:13 AM), rather than investing the time that would

be considered mandatory by any ethical media outlet. Flanagan's superiors allowed the story to be

published, NPR's superiors and legal advisors allowed the story to proceed, even though they

were highly aware that The Article was completely biased, rushed, written negligently and

exercising reckless disregard for the truth.


48. Plaintiff's desire to use his artistic talents to "help change the world for the better of

humanity" has been posted on the artist's website for over 12 years. Defendants' false and

defamatory statements about Plaintiff have caused tremendous damage and harm to Plaintiffs'

personal and professional reputation, including the hard-earned trust he and his wife (who was

also mentioned in the story falsely and maliciously) have gained as spiritual activist artists and

humanitarians. Plaintiff is a professional musician and filmmaker, one who has written, produced,

directed and acted in thought provoking films, and has written, recorded and produced profound

music videos that share his humanitarian visions; the serious allegations published by NPR have

been devastating, and have destroyed over 40 years of hard work and dedication, destroying

Plaintiff's reputation not just as a respectable serious artist and award winning filmmaker and

musician, but also as a humanitarian.

49. Plaintiff is not a public figure. The Defendant acknowledges and admits on the radio show

"All Things Considered" (transcription of Andrew Flanagan speech): "Yeah. So this week, I

started digging into this guy, Bill Yeager. No one has ever heard of him," "A complete unknown,"

and also on The Article: "An unknown musician."

50. Plaintiff's reputation was destroyed; the humiliating insults and allegations were devastating

and the damage was immense because NPR is broadly accepted by the public to be fair, accurate,

honest and ethical.

PARTIES

51. Plaintiff William Conrad Yeager, also known as Billy Yeager, who resides in a

small rural town in Kansas, with a population of 900 people, and is a musician,

filmmaker, performance artist, activist and humanitarian. Plaintiff is a private figure; NPR and every media outlet stated nobody had ever heard of him.

52. Defendant NPR is an American privately and publicly funded non-profit membership media organization, with headquarters in Washington, D.C.

53. Plaintiff was the primary target of the defamatory Article that was published by NPR on March 23, 2017. The Article caused severe harm. The Article stated many false statements, which were written without adequate research into the truthfulness of the statements; The Article was written with negligence and with reckless regard for the truth. Defendant Andrew Flanagan is the author of The Article. Defendant Jacob Ganz is responsible for slandering Plaintiff on the radio broadcast "All Things Considered." Defendant Ashley Messenger is legal council for NPR, and is responsible for making sure that journalists do not make mistakes, stating that "my actual job entails working on content-related legal issues, such as reviewing stories or answering questions for the newsroom."

JURISDICTION AND VENUE

54. This Court has specific personal jurisdiction over Defendants under The Kansas long arm statute K.S.A. Code § 60-308. Defendants have their radio stations located in many cities across America; the causes of action alleged arise out of the Defendants activities in KMUW located in Wichita, Kansas, KANU located in Lawrence, Kansas, and KANH located in Emporia Kansas,

whose radio broadcast "All Things Considered" extends to many other counties throughout the state of Kansas.

55. Venue is proper in this State and County; these serious defamatory statements were not only read by many people throughout the state of Kansas, including the region, county and town that Plaintiff lives in, but were broadcasted on the air; witnesses will testify to this statement. NPR has 11 Member Stations in Kansas. The cities include: Chanute KANQ-FM 90.3, Emporia KANH-FM 89.7, Garden City KANZ-FM 91.1, Great Bend KHCT-FM 90.9, Hays KZAN-FM 91.7, Hill City KZNA-FM 90.5, Hutchinson KHCC-FM 90.1, Lawrence KANU-FM 91.5, Olsburg KANV-FM 91.3, Pittsburg KRPS-FM 89.9 , Salina KHCD-FM 89.5, Wichita KMUW-FM 89.1

56. The malicious attacks on the Plaintiff damaged his reputation in his hometown in Kansas, including surrounding areas not mentioned above such as Strong City, Cassoday, Halstead, Matfield Green, Council Grove and many more, all in close proximity to where NPR's affiliated stations are located. Several of these towns, are only a 15 to 20 minute drive from Plaintiff's residence. This will be verified by a person who had only met the Plaintiff a couple of times in public, at a thrift store and a flea market. After hearing the radio broadcast this person came up to Plaintiff the next time he saw Plaintiff and stated "I heard about you on NPR."

Written and recorded testimony:

My name is Cecil McKenzie. I had met Billy Yeager and his wife multiple times in Emporia, Kansas. I dabble with buying and selling stuff; I had some records to sell, so I did an online search and I came across the NPR article. The first encounter I had with the story was finding out about it online; I saw that article, I read the whole article. I heard the comments on the radio also,

I believe I heard it mentioned on NPR also, because I listen to NPR. I am stating this to corroborate the fact that this was read and heard in Kansas.

Cecil McKenzie

57. Defendant Andrew Flanagan and NPR acted with contempt and malice when they published The Article. Defendant Andrew Flanagan and NPR knew that their only source (John Stacey) was not a reliable source for truthful information about Plaintiff; having never spoken with Billy in over 17 years, he was completely ill-informed about the work Plaintiff had been creating and his journey as an spiritual activist artist, yet he was used as the main source for The Article. Defendant Andrew Flanagan and NPR acted with contempt (when they published The Article) and decided Plaintiff was not worth the time to create a truthful story, where statements are verified and relevant sources are interviewed; Defendants acted with malice when they disregarded the truth that contradicted their story, being more concerned about their own self-interests, instead of being concerned about the damage they would inflict on Plaintiff.

58. Failing to invest the proper time that is required to write an accurate, truthful story, Andrew Flanagan published The Article at 9:13 AM on March 23, 2017. There was no descriptions written about anything that Plaintiff had produced in the last 20 years. Defendant only made references to 2 films that the Plaintiff had produced with his wife in a derogatory manner, saying the films attracted only minor attention (one film was spelled incorrectly). One of the films has not been screened yet, and the other, a surf film, was selected to premiere at the NYC film festival.

59. Defendant never mentioned any of the awards Plaintiff's films had won, or the people that have discovered him, such as John Pierson, whom The Hollywood Reporter called One of the Most Powerful Men in Independent Film. John Pierson produced a segment about the making of Plaintiff's first feature film "Jimmy's Story" (which won 5-awards); it was featured on National television on his show called "Split Screen."

60. Furthermore, even though there were several music videos on Plaintiff's websites and on YouTube and Vimeo (which Andrew Flanagan obviously visited) Flanagan and NPR stated that there was no music to be found except "grainy footage of Yeager" playing guitar at a "backyard jam session." Defendants exercised reckless disregard for the truth. The latest video produced by Plaintiff was published on Christmas 2016 in support of all victims of injustice. This video depicts Plaintiff's true vision and mission as an artist, activist and humanitarian.

61. Yeager and his wife Anais' story about how they met, and their desire to change the world for the better of humanity, was produced into an Award Winning film called "The Film That Changed The World," which won "Most Inspirational Movie" award at the Red Dirt International Film Festival, which is considered to be one of the top 10 film festivals in the United States. Plaintiff's main reason and purpose for being an artist and creating music and films has always been to help the less fortunate, uncover the lies in the world, and encourage people to seek truth.

Exhibit I.  http://exhibitscase.blogspot.com/2018/03/exhibit_70.html

62. There was a 7-minute promotional film trailer of "The Film That Changed The World" on Plaintiff's Official website; 100% of the contents of this film trailer reveal information about Plaintiff and his wife, who have together, for the past 12 years, dedicated their lives to create art that can help to "raise the conscious awareness of humanity" and "bring attention to the injustices and suffering that exists throughout the world." There was also a film review written by Jason Stoneking. NPR never published anything regarding this information, nor tried to contact anyone who had watched the film; NPR's radio show "All Things Considered" made a mockery out of Plaintiff stating Plaintiff was a charlatan, interested in infamy and pulling the wool over people's eyes.

Exhibit  J: Review by Jason Stoneking http://exhibitscase.blogspot.com/2018/03/exhibit_94.html

63.  Plaintiff will provide factual evidence and testimony that will prove beyond any doubt that The Article was written with extreme bias against Plaintiff by a journalist who had an agenda. It was so apparent, that 7 months after this shoddy piece of tabloid news was published, another journalist, Leah Friedman, wrote her own story about the Plaintiff and stated that: "the media swats him ( Plaintiff Billy Yeager) away, because his views, do not go along with the mainstream …" and "In a ridiculously corrupt media and music industry focused on the contribution towards society's downfall and everything of true value, Yeager tries to remain true to his talent and beliefs." but that "the media distinctly wants to suppress all that Yeager has produced and

created." Leah Friedman was contacted immediately after her story was published online; when asked several questions about how she came to this conclusion of truth, Friedman expressed that NPR's story was written with extreme bias, by a journalist who "suppressed" vital information about someone who was creating profound and meaningful art, and concluded that the journalist must have had an agenda.

64. Defendants NPR, Flanagan, Ganz, and its senior editors and advisors were well aware of the damaging effects that this condemning article would have, not only on the Plaintiff's personal life, but also on his work as an artist and humanitarian. NPR's legal advisor Ashley Messenger was also well aware that Flanagan's story was extremely biased, and knew that these outrageous malicious statements were no doubt questionable, and would be highly considered by most other reputable publications to be crossing the line into what would be considered defamation. NPR and Ashley Messenger willingly allowed The Article to remain online for 11 months and counting, despite the fact that, for a period of over 3 months, there were numerous phone calls and e-mails exchanged between Messenger, the Plaintiff and the Plaintiff's wife, explaining reckless disregard for the truth had been exercised (in addition to: negligence, unverified statements, lack of sources, bias against Plaintiff, false light, distortion of information, fabricated lies) and requesting that The Article be removed.

65. Throughout the 3 months of correspondence (from April 21st until June 28th) with NPR's legal advisor Ashley Messenger, The Plaintiff insisted that the complete and whole Article

published by NPR was in fact defamatory and did not in any way, shape or manner depict his true character, or the type of person and artist he is, and that The Article should be removed entirely.

66. NPR's legal team and the board of directors were well aware that Plaintiff was not "an embittered, relentless failure, charlatan, fame and infamy obsessed, focused on pulling the wool over people's eyes …" because of evidence Plaintiff provided, which included videos and articles. The only reasonable conclusion to the bewildering refusal to remove the defamatory Article would be that NPR "assumed" Plaintiff has no power, clout, or money and would never be able to obtain an attorney. Arrogance and pride is no justifiable excuse for Ignorance of the Law. Pro-se.

67. The defamatory Article remained and still remains on the very top searches on all search engines, over and above Plaintiff's web-site when searching for Plaintiff's name on the internet, which is and was responsible for loss of revenue in 2017, and has destroyed reputation and the ability to earn income in the future as well. Ashley Messenger was made aware about the seriousness of this issue, yet NPR refused to remove the story and Defendant instead repeatedly asked the Plaintiff "to specify" exactly which sentence was considered by Plaintiff to be defamatory, to which The Plaintiff stated each time "the complete and whole article."

Exhibit K. (1.) http://exhibitscase.blogspot.com/2018/03/exhibit_59.html

68. To prove Plaintiff's case, music videos, photographs, articles, letters from people attesting to

Plaintiff and his wife Anais' being spiritual artists and humanitarians were sent to Ashley Messenger, including a personal letter from CNN's Heros Narayanan Krishnan (whose Akshaya Trust organization thanked the Yeagers for their hand made flutes that they sent to India, to be given to the destitute and homeless mentally disabled people) and the "Wake Up People" music video, which is devoted to depicting the cruelty, suffering and injustice that exists around the world.

69. Once again, a specific video (pertinent to this case) that was sent to Ashley Messenger (and NPR board of directors) included over a dozen people who spoke on camera and vouched for Plaintiff and Plaintiff's wife sincerity, integrity, courage, spiritual devotion, artistic mission and vision, and dedication to helping others and changing the world. The video was 1 hour and 3 minutes in length, and included artists, teachers, writers, speaking about about Plaintiff and Plaintiff's wife and their work. Most important, the video featured two senior pastors from the Unitarian and Unity Churches from Wichita, Kansas; Tim Lytle and David Carter, who attended the film screening of the Award Winning documentary "The Film That Changed The World." All of these people vouched for Plaintiff's true character, yet Ashley Messenger responded: "You have repeatedly asked NPR to remove the story dated March 23, 2017," … "NPR will remove a story if it concludes that it (sic) not substantially true."

Exhibit K 2: These are 2 of the many people featured in a video (1 hour and 3 min) that was sent to legal advisor Ashley Messenger: https://vimeo.com/248201285

https://vimeo.com/248240498

70. NPR did not want to admit their mistake to the public; their actions proved they had no remorse about destroying the reputation and life of another human being. With all evidence supporting the fact that NPR's defamatory article was in fact "substantially not true but false" (Websters definition of "substantial": "consisting of or relating to substance, not imaginary or illusionary, real, true, important, essential."), Ashley Messenger and NPR refused to remove The Article, even though evidence provided what WAS real, true, important and essential.

Exhibit K3

http://exhibitscase.blogspot.com/2018/03/exhibit_49.html

http://exhibitscase.blogspot.com/2018/03/exhibit_88.html

71. Messenger e-mailed Plaintiff stating: "We have always wanted to hear your viewpoint, therefore, NPR would like to offer you the opportunity to respond to the story in a meaningful way on our site." Evidence will support this was in fact a legal tactic "trick" that NPR's legal team concocted.

72. There are serious contradictions between Messenger's statement and NPR's actions. Defendants never "always wanted to hear Plaintiff's viewpoint." If that were the case, Defendant Andrew Flanagan would have not written a biased story, exercising negligence and reckless disregard for the truth; Defendant would have verified his facts before making defamatory statements such as: "Billy Yeager has invested more of his time being a "trickster- booster" that

he has as an artist." If as Messenger states, NPR would have "always" wanted to hear Plaintiff's viewpoint, Defendant would have invested what would be considered a minimal amount of time (1 hr and 40 minutes) watching the film documentary about Plaintiff, which would have allowed him to learn about the work and mission of the artist that he stated "nobody had heard of," and obtain pertinent information and first hand knowledge, that would have helped him form his own original, ideas and opinions, rather than fabricating lies based on unverified information.

73. Had Defendants "always wanted to hear Plaintiff's viewpoint," they would have reserved a spot for their subject to be interviewed on their "All Things Considered" radio program and consider "All Things" for fairness and accuracy before they announced to millions of people that their subject was a fraud, charlatan and huckster. Their actions proved they never wanted to hear Plaintiff's viewpoint, and NPR's legal team was trying to cover up a very serious violation by NPR and NPR's journalist Andrew Flanagan.

74. Legal advisor Ashley Messenger was clearly being deceptive and dishonest when she included in an e-mail: "You may write up to 1500 words in a response that addresses what you would like the public to know about your career, your motives, your desire to change the world, that your activities have been performances, and other facts that you want to explain (as you have in your emails)."

75. Proof that Ashley Messenger is also responsible for damages and defamation as a cohort, is

the fact that she admits in her own words Plaintiff's "desire to change the world." Messenger

knew this was the truth; Messenger watched the videos and read the stories about Plaintiff. Board

members (supposedly had been informed) and were also well aware of Plaintiff's mission, knew

the story was completely biased against Plaintiff, knew that the defamatory statements in the

Radio Broadcast and the Article had never been verified, there was evidence that proved that

these statements were false, and that The Article had been written negligently and with reckless

disregard for the truth, yet NPR refused to remove the Article.


76. There is no denying these facts, and the statement written by Ashley Messenger herself, "your

desire to change the world," is in fact an admission of guilt, because she knew the truth, yet

Messenger states that NPR will only remove a story if it concludes that it is not substantially true.

This again is a contradiction.


77. Clearly using deceptive tactics so as to be able to cover themselves from being sued for

defamation, Messenger continues (after her offer to Plaintiff: "You may write up to 1500 words in

a response…"): "To be clear, NPR is not promising to publish it; we will decline to do so if we

believe it would not serve our audience or might create liability. Given our communications,

however, I would expect that you can articulate your highest ideals and your artistic vision in a

way that would shine a light on the activities you say have been misunderstood. In that case, NPR

will attach your response to the story."

78. NPR's policy states that: "We are guided by a newsroom policy that says it is inappropriate to remove content from our Website. If a report is inaccurate, we will correct it and state why it has been altered. If relevant new information emerges, we will update or do a follow-up story." It is appalling that Ashley Messenger makes no mention of this offer, or to correct it, except to offer Plaintiff to write about himself. Since when does any serious ethical publication ask their subjects to write about themselves? This offer was a sly tactic so that NPR did not have to admit any wrong, which is what Messenger actually means when she makes reference to a "liability" stating that "To be clear, NPR is not promising to publish it; we will decline to do so if we believe it would not serve our audience or might create liability…"; the liability that it may create is obvious; Messenger who is an attorney, knew this was a blatant case of slander and defamation of Plaintiff's character.

Exhibit . L http://exhibitscase.blogspot.com/2018/03/exhibit_7.html

79. Ashley Messenger wrote: "I would expect that you can articulate your highest ideals and your artistic vision in a way that would shine a light on the activities you say have been misunderstood." Misunderstood? Is this the term the press utilizes for having an agenda, being biased, and refusing to verify facts? Is this term "misunderstood" a term they will stand by in the court of law? We misunderstood you! Again, Messenger states that Plaintiff did in fact have "high ideals." Plaintiff's highest ideals were never considered when Jacob Ganz stated on the airwaves to millions of people that Plaintiff was a "charlatan." Plaintiff's high ideals were not given fair air

time, when Andrew Flanagan and Jacob Ganz decided to ridicule and mock Plaintiff destroying

his reputation. Once again an admission of guilt by Ashey Messenger: Plaintiff has High Ideals.

80. Plaintiff's charity and humanitarian story "may not serve their audience, or may create a

liability" is balderdash, and the only thing that would be subject to "liability" if NPR were to

publish the truth is NPR; this is why Messenger states,"To be clear, NPR is not promising to

publish it…" This deceptive tactic is to provide a bandaid to a bruised Plaintiff that has been

severely injured, hoping Plaintiff would be content with the breadcrumbs that fall from the 3

legged table of NPR.

81. Ashley Messenger makes it clear again, she will only attach Plaintiff's response, meaning she

will NOT remove the original story: "NPR will attach your response to the story," meaning once

the Plaintiff agrees to this offer, perhaps then, Plaintiff will not "technically" be able to sue for

defamation? NPR's "saving vice" is to confuse and deceive Plaintiff, by using contradictory

doublespeak, manipulating the subject they defamed, who they knew was vulnerable and

desperate because of the injury and pain they caused.

82. Proof of the dishonest unethical tactics that were being perpetuated upon Plaintiff, Ashley's

previous statement above ( see paragraph 70 ) states that: "NPR will remove a story if it

concludes that it not substantially true." This is a major contradiction in the most serious manner,

when she makes it clear that they will only attach a 1500 word story by Plaintiff, yet also states,

"To be clear, NPR is not promising to publish it." There is nothing "clear" except a violation of

Legal Ethics, and someone who is trying to confuse Plaintiff using every tactic in every

conceivable manner "to not remove The Article," because this would clearly be an admission of

guilt.

83. Jacob Ganz is a senior editor who coordinates coverage on NPR newsmagazines and oversees

special projects and feature coverage. Since the early days of licensing, radio broadcasters have

been "mandated": Websters Definition of "mandated" is: "instructed to act in a certain way," to

"serve the public interest." Jacob Ganz stated that the Plaintiff was a "charlatan and a huckster"

on the airwaves. This did not serve the public interest.

Exhibit M. "All Things Considered" Radio Broadcast NPR:  https://soundcloud.com/damon-

blalack-836562376/npr-radio-andrew-flanagan-and-jacob-ganz

84. When NPR was established in 1971, Bill Siemering, who was a member of the founding

board of NPR, was the original author of its mission statement, which stated, "National Public

Radio will serve the individual; it will promote personal growth; it will regard the individual

differences among men with respect and joy rather than derision and hate; it will celebrate the

human experience as infinitely varied rather than vacuous and banal; it will encourage a sense of

active constructive participation, rather than apathetic helplessness."--Bill Siemering

85. NPR's legal advisors no doubt will adamantly defend their first amendment rights to "freedom of press" and the right to be able to broadcast their selective choice of words, such as the ones expressing derision towards Plaintiff in this case, however, while freedom of speech in the United States is a right protected by the constitution, there are exceptions as recognized by the United States Supreme Court, which states there are limitations on the First Amendments guarantee of free speech regarding the airwaves which has been given reduced constitutional protection.

a)  a "significantly reduced" amount of protection is afforded for uninhibited speech when the government acts as "subsidizer" or speaker, is an employer, controls education, or regulates the following: the mail, "airwaves," legal bar, military, prisons, and immigration.

86. One could perhaps realize that there are serious infractions and infringements being committed by NPR itself against, not only the Supreme Courts Ruling, that there are restrictions to "freedom of speech" regarding the radio airwaves, but infractions against the first Amendment itself, and against the public it serves, if one takes into account the statement of "freedom of speech" and "freedom of press" in and of itself; you are "free" to speak and there is "freedom of the press," but it does not mean there won't be repercussions for defamation.

87. May I present this case against NPR which is publicly funded, and government subsidized.

(a) The First Amendment is relevant to public broadcasting, but it is the right of the viewing and

listening public, and not the right of the broadcasters, which is paramount. Pp. 395 U. S. 386-390.

(b) Even speech that enjoys the most extensive First Amendment protection may be subject to "regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."

(c) As stated in 395 US 367 - Justia US Law, it cannot be said that when a station publishes personal attacks, it is a misconstruction of the public interest standard to require the station to offer time for a response, rather than to leave the response entirely within the control of the station which has attacked either the candidacies or the men who wish to reply in their own defense.

d) No man may be prevented from saying or publishing what he thinks, or from refusing in his speech or other utterances to give equal weight to the views of his opponents. This right, it states, applies equally to broadcasters.

88. If the First Amendment is relevant to public broadcasting (NPR), but it is the right of the viewing and listening public, and not the right of the broadcasters, which is paramount, and I, the Plaintiff, am the Public, who is paramount.

a) If the station which has attacked either the candidacies or the men (men - meaning Plaintiff) who wish to reply in their own defense, and I the Plaintiff have not been given any chance, or allowed to reply on my own defense when NPR broadcasted that "Plaintiff was a charlatan and huckster" to the world.

b) If no man may be prevented from saying or publishing what he thinks, or from refusing in his speech or other utterances to give equal weight to the views of his opponents, and I the Plaintiff have been refused to be given my chance for speech or utterance, to face my opponents.

c) If reduced amount of protection is afforded for uninhibited speech when the government acts as subsidizer, and NPR is subsidized by the Government.

d) If the First Amendment does not protect private censorship by broadcasters who are licensed by the Government to use a scarce resource which is denied to others, then consider, could we say Plaintiff's "Freedom of Speech" has in fact been violated by NPR?

e) If NPR is funded by the Corporation for Public Broadcasting, which is a privately owned non-profit corporation which is funded by the Federal Government; if the Congress and Supreme Courts have deemed "freedom of speech" for all, yet the Government funded NPR has suppressed Plaintiff's "freedoms of speech," and denied him the chance to give equal weight (not after the defamatory announcement that Plaintiff was a "charlatan" and a "huckster" was made, but "during" their broadcast so that Plaintiff could defend himself); and if as stated above, there are restrictions on the first amendment, then consider, would not "All Things Considered" NPR radio broadcast be deemed by the United States government and its American citizens to be nothing more than a propaganda machine operated by "the Gestapo," who is allowed to speak against its private citizens, defaming anyone's good character, while hiding behind the Amendments of "freedom of press," yet censoring the Plaintiff's "freedom of speech"?

89.  As stated above, significantly reduced amount of protection is afforded for uninhibited speech when the government acts as "subsidizer" or speaker, is an employer, controls education, or regulates the "airwaves"; and it is a fact that NPR's radio show "All things Considered," is considered "airwaves." Also consider: "uninhibited speech" is defined as "expressing one's feelings or thoughts unselfconsciously and without restraint," which is what Jacob Ganz and Andrew Flanagan performed. The United States Supreme Court has not hesitated to consider

limitations to the First Amendment rights in certain cases, therefore it cannot be considered lawful for a radio broadcast to be able to tarnish the private citizen under these guidelines, considering the United States governments has set restrictions for airwaves, and also for those who are government subsidized.

90. In presenting the information (regarding restrictions) above, Plaintiff proves that by the laws and restrictions that have been set for airwaves, Plaintiff was denied his rights, and therefore NPR violated the "rights" of the Government, and its American citizens.

91. The disputes between the "freedom of the press" and "freedom of speech" have been discussed, debated, and consequently should still be deliberated. When Congress declared: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press"… let all consider carefully. Freedom of speech was chosen to preside first and foremost in this sentence, not "freedom of press"; discernment of the "order" should conclude what our Forefathers had intended, freedom of speech should always prevail.

92. Ashley Messenger admitted that Plaintiff had "high ideals" and a "desire to change the world"; Ashley Messenger wrote that the defamatory Article would be removed if it were substantially not true; all things considered, if NPR stated and indicated Plaintiff was a fraud and a failure with no purpose and meaning in his life, motivated by fame and infamy, and Ashley

Messenger states that Plaintiff has high ideals and desires to change there world, is this not substantially contradictory and NPR 's Article substantially false? NPR and NPR's legal advisors knew the defamatory Article was 100% biased against Plaintiff and knew the immense damage and emotional distress they had caused, yet stated to Plaintiff they could not promise that his true words would be published, is this not subterfuge?

93. All things considered: NPR, Andrew Flanagan, Jacob Ganz, their superiors and senior editors, Ashley Messenger and the NPR legal team, including all of those who were informed about the case, are guilty of defamation, libel, slander, bias, false light, negligence, reckless disregard for the truth, and malice.

94. Our Country has laws and protections, and it is Plaintiff's hope that one day the Courts will abrogate this "free for all" "right of the press," which is allowing the press and the media to suppress the Public's "right" to freedom of speech. May the courts implement laws that will allow equal time to each party, and allow one to be able to defend one's reputation before a government - subsidized - public - funded - radio station, one that has been given carte blanch to defame the American citizen, destroying  someone's life through negligence, reckless disregard for the truth and malice, and more so (a crime to consider) an institution that has the audacity (NPR) to ask for donations from the Public, whom they crucify.

FACTS

95. Plaintiff is a songwriter and multi-instrumentalist. Plaintiff has written, produced and directed 5 feature films; 2 of those films have won several awards; "Jimmy's Story" a film (an innovative style intertwining 5 different film genres) that took over 23 years to film, was awarded Best Documentary at the Palm Beach International Film Festival and won 4 Awards at the Dahlonega International Film Festival in 2003. Plaintiff was invited to be a guest speaker at the Dahlonega International Film Festival in 2003. The story of the making of "Jimmy's Story" was featured on Bravo television in 1997. All films are listed on IMDB.

Exhibit N http://exhibitscase.blogspot.com/2018/03/exhibit_23.html

96. Plaintiff's film "A Perfect Song" was written, directed, and produced by Plaintiff. The film premiered at the Delray Beach Film Festival, and Plaintiff won Best Actor award. Plaintiff was invited to be the guest speaker for the Montezuma Film Festival, which is located in Costa Rica, in 2008, to advise upcoming filmmakers about how to produce, cast, and direct their own movies without investors, backers and big production film crews. "The Florida Highwaymen" is a documentary film written, produced and directed by Plaintiff about some of America's most famous folk artists "The Florida Highwaymen." Plaintiff's surf film documentary "Sebastian Beach One Fine Day" premiered at the NYC Surf Film Festival in 2012.

Exhibit N1 http://exhibitscase.blogspot.com/2018/03/exhibit_38.html

97. There are 2 documentary films that have been produced about Plaintiff's life as an artist,

activist and humanitarian. "The Film That Changed The World" won "Most Inspirational" Movie

award at the Red Dirt International Film Festival, handpicked by the festival's owner, Damon

Blalack, who stated: "'The Film That Changed the World' is a full-force transcendental journey

through the film medium to advance the human-consciousness and plant seeds for positive

change." The second film about Plaintiff's life is called "Billy Yeager The Ineffable Enigma,"

which was completed in 2016.

98. Plaintiff quit the music business in 1995 to become a filmmaker; in all of Plaintiff films there

is a passionate spiritual devotion to tell stories about finding meaning and purpose in life. In "A

Perfect Song" (2002-2004) Plaintiff performs the role of Lloyd, who is a musician that chooses to

sacrifice his life, and devotes himself to God and humanity, trying to compose "the perfect song,"

one that will heal the world of fear, hatred and disease.

99. Plaintiff met his wife in 2005; together they began a spiritual quest to make a film that "could

change the world." Plaintiff was working in Palm Beach when he met singer Rod Stewart who

also became a fan and a supporter of Plaintiff's music. Plaintiff performed for high society events

and private parties in Palm Beach, Florida, where he was hired to be the house musician at The

Breakers Hotel Private membership club, also at the Ritz Carlton in Manalapan, and Mar-A -

Lago in Palm Beach.

100. Plaintiff was earning a higher than average income for a working musician, but decided to

abandon his comfortable life in  Florida; Plaintiff and his wife decided to give away most of their

possessions, bought a used 14-foot travel trailer and moved to the desert where they lived off the

grid for over 3 years while completing their film "Jesus of Malibu."

Exhibit O. http://exhibitscase.blogspot.com/2018/03/exhibit_1.html


101. Plaintiff has been written up in numerous articles not only as an artist, but also as being a

humanitarian, as a musician that has dedicated his life trying to find ways to create music that can

raise consciousness and heal disease, as a filmmaker creating meaningful films that make people

think and help to raise conscious awareness. Also Plaintiff and his wife have produced many

videos trying to raise awareness about the injustice and suffering in the world; making these

videos, takes a lot of time and effort; Plaintiff and his wife have never made a profit from any of

these videos, yet Jacob Ganz stated plaintiff was a charlatan (definition: swindler).


Exhibit: P and P1  http://exhibitscase.blogspot.com/2018/03/exhibit_55.html


102. Plaintiff worked as a professional musician from 1974-1985; Plaintiff has been writing and

recording music since 1976, and has written and recorded over 2600 songs. Plaintiff has

produced, written, directed, and acted in 5 feature films. Plaintiff spent over 23 years filming his

first movie "Jimmy's Story"; Plaintiff spent 5 years of preparation and 3 years filming, together

with his wife, producing their film trilogy. Plaintiff has won awards for his films, and has also

won awards for songwriting contests; Plaintiff was one of 3 "feature performers" for the

Internationally known Songwriters in the Round in 2003, etc. Yet NPR published: "Yeager, for all the belief he has in his promise and his failures expressing it, has repeatedly poured more of his creative energy into being a trickster-booster than he has an artist."

103. NPR specifically writes about and broadcasts stories about well-known, and semi- well known artists, seldom or never do they mention, write or broadcast any story about someone completely unknown in the music industry such as Plaintiff. NPR, Andrew Flanagan, its senior editors and superiors, all exercised negligence and reckless disregard for the truth, and allowed these defamatory statements to be published for several reasons. The extreme bias, contempt, derision, hostility are clearly apparent. Defendant Andrew Flanagan was well aware of the facts stated above about Plaintiff, yet he chose to suppress these facts, and NPR allowed him to do so. It is inconceivable that there would be no reservations from even Flanagan's superiors about publishing such defamatory statements that were never verified.

104. Showing their contempt for Plaintiff, as if he was a nonentity, NPR and its superiors allowed this decision (of the refusal to remove the Article) to proceed for months, without rectifying the matter, because it was obvious Plaintiff was clearly not rich or famous (Defendant Flanagan stated no one had ever heard of him) and therefore there would be no repercussions for the fabricated defamatory statements. Everyone at NPR knew the fact that: defamation lawsuits are for the wealthy, who can afford to save there reputations. NPR has never attacked, ridiculed and insulted any famous person in the manner of Plaintiff, for they would never feel "safe" in doing

so. If there be any other reason to bring this case to court besides repairing one's reputation, it would be to punish (punitive damages) the most hypocritical media outlet that is so fearful of criticizing what should be criticized, and instead chooses to defame an unknown artist who is trying to make a difference in the world.

105. The media feels it is necessary to adapt to the times. By writing and publishing a sensational tabloid style article, Flanagan knew it would gain the interest of a more diversified young demographic audience from the social media who are easily influenced and enjoy reposting sensational stories and making cynical comments. The Article (100% biased against Plaintiff) inspired nothing but extremely negative comments, full of contempt for Plaintiff.

Exhibit P. (c) http://exhibitscase.blogspot.com/2018/03/exhibit_15.html

106. People from all over the world have been deeply affected in a positive and profound way from the work that Plaintiff has produced, and from the films that have been produced by other producers about Plaintiff. Many have stated that watching Plaintiff's and Plaintiff's wife videos and work have changed their lives. Plaintiff and his wife are vegans and also create music videos that defend animal rights, confronting those who inflict cruel treatment upon the animals.

Exhibit P (d): https://thefilmthatchangedtheworld.com/about-jesus-of-malibu/

107. With so much positive information available to write and publish about Plaintiff, it proves

without question that NPR abandoned the ethics they state on their website such as: "To tell the truest story possible, it is essential that we treat those we interview and report on with scrupulous fairness, guided by a spirit of professionalism. Hearing from a variety of people makes our journalism stronger and more complete. In our reporting, we seek various perspectives on an issue, as well as the evidence supporting or countering each one." Defendant refused to use the positive perspectives that were available from a variety of people.

108. Long live the phrase in the United States Declaration of Independence "Life, Liberty and the pursuit of Happiness." But let it also be said that true happiness can only come from giving your whole self (mind, spirit and soul) to your fellow man, knowing that there are many who suffer. When this pursuit of the highest virtue of man called empathy and compassion has been stripped and taken away, so that you cannot extend this Universal love to others as liberty should allow, a man might as well kill himself, for he is good only for self, and that man's heart will die a slow death by being stripped of that "life," and "liberty" and the "pursuit" of the purist love and happiness that man can attain: "Life, liberty and happiness for others."

109. With a budget of over 200 million a year, and having the luxury and safety of having a legal advisor to double check journalists stories, there is no fathomable reason or excuse why the reputation of someone unknown, someone with a purpose and mission such as Plaintiff's, had to be destroyed. The Article by NPR and statements broadcasted by "All Things Considered" could be deemed one of the most obscene pieces of sensational lies ever published and broadcasted on

NPR. NPR's legal advisors authorized The Article to be published, and allowed the malicious

attacks on the Plaintiff to be broadcasted, destroying the reputation of someone that NPR never

interviewed.


110. The Defendants were well aware of the information about "Mindy's Wish," which is featured

on the Plaintiff's websites. Defendants were also aware that the Plaintiff and his wife were

preparing to perform benefit charity concerts at an underground missile base in Kansas, to raise

money to purchase low cost wheelchairs to help land-mine victims. Defendants refused to

mention any of this information. Defendants also refused to include the music video for Mindy's

Wish, which has been posted on youtube since 2011.

Exhibit: https://www.youtube.com/watch?v=MidIdOmYuQE&t=34s

Exhibit. Q http://exhibitscase.blogspot.com/2018/03/exhibit_37.html


111. The Plaintiff has worked with many professional people in the music and film industry for

over 40 years. People such as professional musicians, agents, talent scouts, sound engineers,

lighting technicians, sound technicians, camera operators, television show producers, film editors,

directors and producers, stage managers, personal managers, photographers, actors, and other

journalists. Defendant refused to make contact with any of these professional sources.


112. NPR is extremely serious with regards to their ethics, and considers its journalistic standards

to be one of the highest, and on the NPR website there is the NPR Ethics Handbook that includes

information about fairness, honesty, accuracy, and impartiality, etc. The Handbook is a word

count of over 124, 015 words. This Handbook explains in intricate detail the rules, guidelines and

principles of NPR's journalistic standards.

113. It should be noted that a prestigious media outlet, one such as NPR whose total net assets in

2016 was 319,068,516, and receives over 60 million dollars from Corporate sponsorship, has the

economic freedoms and luxury to hire a legal team that is supposed to protect all of its assets.

These stringent standards about ethics, mission and principles were created to assure that none of

NPR's journalists would cross a line that would be even remotely close to being considered a

liability.

114. With such care and attention to detail in their Ethics Handbook and mission statements, there

is no doubt these Handbooks were written by NPR's legal team / department, which also means

there is accountability above and beyond, and leaves little doubt that when using words such as

"charlatan" and "scam," these type of words should, and would be checked and double checked

by NPR's legal department before ever being used, quoted, or published. Such perilous words as

"trickster- booster" would be considered more suitable for someone who has bilked someone out

of their money and has been proven guilty. These are serious allegations to be made about

anyone.

115. With so many codes, manuals, and handbooks concerning these matters, one could almost

imagine weekly staff meetings with NPR's legal advisors briefing and debriefing journalists about

shoddy journalism leading to possible libel / slander  lawsuits. The Defendant's choice of

egregious words and descriptions, the fact that the Article was completely biased against Plaintiff,

and the fact that Andrew used only one source who ever met Plaintiff, are just a few reasons that

would have raised many serious "redflags" for NPR's legal team.


116. NPR's legal advisor Ashley Messenger's job description is as follows: "currently in-house

counsel for NPR, specializing in issues that affect news gathering and dissemination." Ashley

Messenger was interviewed on a radio podcast in May 16, 2014; Messenger stated that: "I helped

create the Ethics Handbook, which was a lot of work but a very valuable exercise." When asked,

"You're a Senior Associate General Counsel at NPR. What does that mean?" Ashley Messenger

stated: "Mostly it means I'm a lawyer who has been around long enough to be called "senior."

But, really, my actual job entails working on content-related legal issues, such as reviewing

stories or answering questions for the newsroom."


117. Considering Messenger's answers, one must assume that Ashley Messenger would have

"reviewed" Flanagan's story, checked it for "content-related legal issues," and would have had

serious doubts, and a high degree of awareness that the descriptions were perilous. Messenger

would have asked Flanagan where he had obtained his information from; she would have asked if

all of his information was verified by many sources according to their rules; Messenger would

have had serious reservations about publishing a 1200 word, "100 % one-sided" biased story that

contained over 41 negative descriptions, about a non public figure, an unknown artist (with a 40 -

year professional career in music and films on his resume), and about broadcasting on the

airwaves that Plaintiff was a charlatan to millions of people around the world.

118. Defendant stated that Plaintiff  "has repeatedly poured more of his creative energy into being

a trickster-booster than he has an artist."

NPR's Handbook states: Don't be careless. Keep your opinions to yourself. Imagine what you say

or write landing in an AP story or in The Washington Post, and imagine the damage that could

cause you or NPR. Also, Timeliness is a dimension of completeness. Our responsibility to be

timely doesn't lessen our need to be accurate and fair. We have a heightened responsibility to tell

our audience exactly what we know and how we know it, as well as to emphasize what's still

unknown or unverified.

119. These defamatory statements (charlatan, bamboozle, trickster- booster, etc) would be

considered highly questionable by any journalist that witnessed the "Wake Up People" music

video; NPR showed great negligence not verifying these defamatory statements, but the

seriousness of the magnitude of reckless disregard for the truth that Defendants Flanagan, Ganz,

his superiors, and NPR's legal team exercised is of most concern; in that they were well aware of

much of the factual information that has been provided herein, yet they refused to include any of

this information in their Article because it contradicted their allegations 100%.

Exhibit R. Wake Up People music video: https://www.youtube.com/watch?v=QOo_7XYeRSc

120. NPR refused to invest the proper amount of time required to write a truthful story, and instead published their defamatory story well aware that they would cause immense damage to Plaintiff's reputation, work and personal life. NPR destroyed an unknown artist who had been working for many years trying to make a difference, one who had worked with a team of people for over a year to begin the "What 4?" Missile Base Charity concerts. There is an inexcusable, unfathomable degree of failure at every level, more so when considering that journalists salaries at NPR begin at 94,000.00 to 116,000.00 a year.

Messenger was quoted in the radio podcast stating: "Most libel problems, however, can be avoided by good, rigorous, ethical journalism." There are too many of these types of admonitions in NPR's handbooks, and also being stated by its legal department, to be regarded as merely whimsical musings.

121. In 2017, Plaintiff and his wife Anais were to begin a benefit charity concert event, in the midwest Kansas region. Dates had been set for the Fall of 2017. The Yeagers had been given the opportunity to screen their movie, and perform their music, and theater play, at a privately owned underground missile base located in Kansas; the proceeds from the event were going to be used to purchase wheelchairs for people who are victims of underground land-mine explosions.

122. For over 1 year,  prior to The Article and Radio Broadcast, the Yeagers were busy full time,

writing and composing music, writing and rehearsing the theater play, creating costumes,

designing the set, and finding the musicians for the band that was going to be used for the benefit

concerts titled "What 4?" . (The What 4? Title refers to Life; What is life 4?)


123.  Plaintiff's recorded music was to be pressed onto vinyl records; limited editions were going

to be sold; the documentary film titled "Billy Yeager The Ineffable Enigma" had just been

released. A team of several people were involved in the marketing and promotion of the

underground missile base concerts and limited editions of vinyl records that were going to be

released on the 10th anniversary of Record Store Day; proceeds from record sales, documentary

film and missile base concerts were going to be used to purchase wheelchairs for land-mine

victims. Exhibit: https://billyyeager.social/


124. On March 23, 2017, immediately after The Article was published and radio show "All

Things Considered" broadcasted that Plaintiff was a charlatan and a huckster, because of the

slanderous and libelous statements and serious allegations Plaintiff's reputation as an artist,

musician and filmmaker was  destroyed. Plaintiff's ability to perform his benefit concerts, sell his

limited editions of vinyl records, organize film screenings, earn income as an artist, and to be able

to continue his charitable work was destroyed.


125. The film trailer of the documentary film about Plaintiff's life and artistic career, music, films

and mission was posted on Plaintiff's website. Most all professional film trailers are 1 minute to 2

minutes in length, this film trailer was 3-minutes in length. At the end of the film trailer one of the

music collectors that is featured in the film states, "Not many musicians choose that kind of path."

This reference is being made to the fact that Plaintiff abandoned a career in the superficial

corporate world of the music and film entertainment industries, and chose a spiritual path instead.

Instead of simply entertaining the public and making a good living, the Plaintiff chose to dedicate

his life to raising conscious awareness in the world and helping those who suffer and are victims

of injustice. There is no question to the sincerity of the statement by the record collector, and it

was obvious to Defendants NPR, Andrew Flanagan and Jacob Ganz, but none of them took the

time to watch the movie, because they already had their sensational fabricated story that fit their

agenda.


126. Defendants were well aware of Plaintiff's benefit concerts at the underground Missile Base

in Kansas, but they purposely avoided mentioning anything regarding this information (and did

not try to contact anyone at the missile base) or Mindy's Wish (which would have been the most

pertinent information to talk about regarding Plaintiff's purpose and mission); it is obvious that

mentioning either one of these topics would contradict their biased statements. Instead NPR made

defamatory allegations such as: "The story of Billy Yeager is one of purposeless obfuscation,"

and "Yeager, for all the belief he has in his promise and his failures expressing it, has repeatedly

poured more of his creative energy into being a trickster-booster that he has as an artist."

Exhibit S: Ana Alicia http://exhibitscase.blogspot.com/2018/03/exhibit_12.html

127. Damage is not only about the Plaintiff, Plaintiff's wife was also included in The Article; a quote was published that was an outright lie, and the lie was malicious; Plaintiff's wife should have never been included in The Article in such a manner; Plaintiff's wife was intentionally used in The Article to embarrass her together with her husband; The Article also caused Plaintiff's wife immense pain.

128. Damages are not only directed to Plaintiff and his wife, there were the people who were counting on the Yeagers performing, there were musicians, artists, and other people who were interested not in just monetary rewards, but the reward that comes from giving, and most important, there were the land-mine victims who would have been provided with wheelchairs.

Exhibit  Mindys Wish http://exhibitscase.blogspot.com/2018/03/exhibit_68.html

129. NPR manipulated their readers into believing the only music Plaintiff had available on the web was "grainy footage of Yeager shredding in a backyard jam session." Readers' comments to The Article prove that no one was interested in watching a film (Billy Yeager The Ineffable Enigma) about a charlatan, a scammer, a failure, an embittered musician, who had no talent and no music.

Exhibit: Little Train music video (Published on March 26, 2012): https://www.youtube.com/watch?v=m7A9f_sqQtg&t=117s

130. The Plaintiff is not a public person, but a very private person in many regards. Plaintiff and his wife have been residents in a small town in Kansas, where the population is 903 people, for several years. It is in this town, which consist mostly of 9-5 hard working families, where children play softball, the local 4 H club, parade and rodeo are people's favorite pastimes, farmers drive columbines and tractors down the roads, and crime is nil, where Plaintiff and his wife are accepted amongst the town's folks. Such a small midwestern town, is certainly not a place for one who desires to seek attention, fame or infamy. Plaintiff and his wife have remained one of their community's quiet, "keep to themselves" couple, fitting right in with their humble surroundings.

131. All of this information above was no secret either; Defendant ignored it, but went even further; with no empathy or compassion for his subject, and with much cynicism and malice, Defendant Andrew Flanagan added insult to injury; Defendant made the preposterous statement that all of this attention (meaning NPR's insulting defamatory Article itself and holding a sales record over the musical artist known as Prince) "might be a form of infamy that he could, for once, be satisfied with." This statement depicted the Plaintiff in such a deep measure of false light, and also this description (and many others) would be considered (by the legal term) to be "fighting words" because of the severe humiliation and emotional distress they caused to Plaintiff and also to those who love Plaintiff. Plaintiff will provide in court many people who will testify of the anger felt, and the conviction to "fight back." This is not something Plaintiff necessarily condones, but words are able to cause immense pain, especially when they are obvious outright lies, made with malice, to everyone who knows better.

132. Defendant Flanagan's Article is dedicated to making his readers believe that the sole purpose of Plaintiff's life and his only desire is to get attention because he is obsessed with fame and infamy. As a 60 year old man who has earnestly tried to become a better human being, one who has renounced a world of vanities and being in the public limelight, and committed himself to making a difference in the world, this may be the most offensive remark ever written about myself. My spirit grieves and my soul hurts inside, that I even have to address this issue in this lawsuit… Laying aside all my hurt, pain and anger, I only have pity and prayer for those who would do such a deed.

133. For over 3 years, most of the community where the Plaintiff lived did not have a clear idea what kind of artists Plaintiff and his wife were. Plaintiff and his wife decided to finally let the mystery be known, and the local newspaper in their small town wrote a feature story that informed their community that the Yeagers were musicians, filmmakers, activists and humanitarians who were trying to help change the world for the better of humanity.

134. At first, reluctant about how people would re-act about their activist and humanitarian work and performance art, on December 12, 2016, Plaintiff and his wife invited the town's people to be a part of one of their activist music videos. A large group of citizens gathered together to sing on the chorus of one of Plaintiff's songs called "Wake Up People." The song was a call for people to "wake up" to the suffering and injustices of the world. Plaintiff and his wife brought a film

camera, the participants rehearsed the song and they were filmed by an old mill. The town's

people came out to support their cause, their singing was edited into the music video.

Exhibit S   http://exhibitscase.blogspot.com/2018/03/exhibit_89.html


135. On March 25th, after 2 days of excruciating humiliation, hate mails, and having to sift

through comments comparing Yeager to a loser, failure, washed up trailer trash, Charles Manson

figure, the Yeagers went to a city nearby to purchase their groceries. While getting water at an

outdoor water bottle filling station, a man who had only talked to the Yeagers a couple of times

before came up and informed Plaintiff he had read about him in NPR.


136. The immense suffering from March 23, 2017, destroyed every natural thought for the

Plaintiff and his wife to feel comfortable in their own home town. Feeling judged (how could

people think NPR to be wrong?) Plaintiff has had a difficult time adjusting to the shame he has

unfairly had to deal with, closing himself off from the outside world. Since the day NPR's story

about Plaintiff was published he has had to endure emotional damage, pain, stress and anxiety on

a daily basis. Rather than to confront or defend himself against such a well known institution that

has been supported and funded by the public for many years, Plaintiff has had difficulty

remaining in contact with people, which has led Plaintiff into a life of seclusion from the

community.

Exhibit Hometown

Richard and Sharon Clute from Cottonwood Falls transcript of recording available.

Hi Billy and Anais, this is Sharon, I told everybody I would call and check on you, we were sitting around talking last night, and your names came up, we haven't seen you all in so long, seems like forever, anyways, some people said they haven't even seen you since we finished that filming in the back yard, I wanted to check on you and see that you guys are ok, I see your car around just haven't seen you all, give us a call when you get a chance.

137. If Plaintiff and his wife would have needed something, it would have been some help to promote their mission and cause to "help those who cannot help themselves." NPR could have shared the Yeagers' music videos, asked Plaintiff and his wife to perform music for their "live on the air" Tiny Desk Concerts, which NPR makes available to musicians, and are broadcasted across the world everyday. NPR could have invited Plaintiff and his wife to speak on their show about their desire to change the world by raising conscious awareness; Plaintiff and his wife would have been able to explain the underground missile base concerts, the theater play they wrote and produced, and the screening of the film on the 47 ton steel door. NPR could have invited people to visit their website; NPR could have been a support team to help sell tickets for the benefit concerts; they could have dedicated time to allow Plaintiff to speak about the amount of underground land-mines that still exist; the public could have been made aware of how to become involved; instead NPR acted negligently, with reckless disregard for the truth, with bias, they mocked Plaintiff, labeled him as a scammer, and destroyed the Charity Benefit Concerts completely when they Broadcasted over the air-waves that the Plaintiff was a charlatan.

138. Had the Defendants Andrew Flanagan, Jacob Ganz, and all involved, followed their code of Ethics this would have not happened. Plaintiff believes the millions of people who donate millions of dollars to NPR would have found this educational, inspiring and rewarding. After hearing the radio broadcast, the owner of the underground missile base informed Plaintiff that he wanted to cancel the concerts permanently, and did not want to work with Plaintiff and his wife anymore.

139. As a direct result of the aforementioned acts by Defendants NPR, Andrew Flanagan, Jacob Ganz, and all their superiors, Plaintiff has suffered economic damages, mental pain and suffering, anguish, emotional distress, loss of enjoyment of life, anxiety, loss, damage to reputation, embarrassment, humiliation, shame; damages will continue and will affect not only Plaintiff, but people from all across the world who would have benefited from the Plaintiff and his wife's help as artists and humanitarians.

CASE FACTS

140. The Article entitled "The Most Expensive Record Never Sold, Discogs, Billy Yeager and The 18,000 Hoax That Almost Was" was written by journalist Andrew Flanagan and published by NPR (National Public Radio). The Article was published to a worldwide audience on NPR's website. A true and correct link of the online edition of The Article is attached hereto as Exhibit A.

Exhibit A. https://www.npr.org/sections/therecord/2017/03/23/521216130/the-most-expensive-record-never-sold


141.  "All Things Considered" referred to herein as (Radio Broadcast) slandered Plaintiff on the airwaves, stating that he was a charlatan and huckster to an audience of millions of people across the world. A true and correct copy of the online broadcast and sound file from "All Things Considered" is attached hereto as Exhibit B.

Exhibit B. https://www.npr.org/2017/03/24/521414750/music-news-chuck-berry-soundcloud-kendrick-lamar


FACTS

142. William Yeager is a musician, filmmaker, activist, performance artist and humanitarian.


143. The following published statement is false and defamatory. NPR's Article written by Andrew Flanagan begins: "This is the story of a hoax that almost was. Its motivating force was a hunger for fame or infamy."

Fact: Plaintiff is not and has never been driven or motivated by a "hunger for fame or infamy";

Plaintiff is driven by a divine "force" that has instilled a sense of purpose and meaning in his life;

Plaintiff's mission and desire has always been to "help those who cannot help themselves."

This is a film trailer of the Award Winning Film Documentary "The Film That Changed The World," which won "Most Inspirational" movie award at the Red Dirt International Film Festival.

It must be noted that this video was uploaded over 2 year ago.

Exhibit A. https://vimeo.com/153199300

This is a promotional video of Mindy's Wish (Plaintiff's unofficial 501 Charity) which was created with the desire and hope to be able to provide wheelchairs to land-mine victims. It must be noted that this video was uploaded in May 7, 2011.

Exhibit B. http://exhibitscase.blogspot.com/2018/03/httpsyoutu.html

Defendants refused to mention any of the videos in NPR's story, or "All Things Considered" radio show. Both videos featured people that were witnesses of Plaintiff's work; Defendant did not contact any of these people, including Nick Duggan who is included in video "Mindy's Wish." This is an article dated from 2008; this article clearly mentions Plaintiff's desire and mission in life and as an artist.

Exhibit C. http://exhibitscase.blogspot.com/2018/03/exhibit_68.html

This is a published article from the Plaintiff's hometown newspaper published in 2012; it clearly states what Plaintiff's mission and purpose in life and as an artist are.

Exhibit D. http://exhibitscase.blogspot.com/2018/03/exhibit_84.html


144. The following published statement is false and defamatory: "Billy Yeager, a Florida man who has pursued musical fame (or at least notoriety) for 37 years, by his own account."

Fact: Plaintiff pursued a career as a songwriter; Plaintiff tried to succeed like any other songwriter, who wishes to make a living with their talent; Plaintiff worked extremely hard for many years on his craft. There is a monumental difference between pursuing a goal and trying to

perfect your craft as an artist (Violinist for a symphony) and someone who is pursuing "fame and

notoriety" and I doubt that a Grammy Award Winning artist such as Bruce Hornsby (who

discovered and helped Plaintiff for many years) would be interested in discovering and supporting

another artist that is seeking "fame and notoriety."

a) Also the word "notoriety" that was chosen by Andrew Flanagan is again defamatory. The

definition of notoriety is: "the state of being famous or well known for some bad quality or deed."

Plaintiff has never pursued notoriety or has been known for a "bad quality" or "bad deed" and this

cannot be proven.

145. The following published statement is false and defamatory. "for 37 years, by his own

account."

Fact: the statement is extremely defamatory. Reiterating the statements in the above paragraph,

Plaintiff has never for 1 day sought fame, or notoriety, and the 37 years is an extremely

exaggerated lie that was fabricated to make Plaintiff appear as even more pathetic. Plaintiff

devoted himself to music for many years (still loves and continues to develop his music), writing

and recording over 2600 songs, and pursued the business of music for exactly 14 years (1981-

1995), has produced films since 1995, and has never pursued notoriety or fame.

146. The following published statement is false and defamatory: "Yeager has been stymied

repeatedly."

Stymied is defined as "hindered progress." Plaintiff has never been stymied.

a. Fact: (1983) 5 songs from Plaintiff's first album were finalists in a National Song writing contest. Plaintiff has never been stymied.

b. Fact: (1984) Plaintiff was discovered by Columbia Records president Chuck Gregory who founded his own label HME records, whose artists included Gino Vanelli. Plaintiff has never been stymied.

c. Fact: (1985) Plaintiff's second album was played on all of South Florida's radio stations; the album was recorded at Circle Sound; Yeager was the guitar player for the Internationally recognized band "Inner Circle" from 1985-1986. Plaintiff has never been stymied.

d. Fact: (1990-1994) Plaintiff was discovered by Grammy Award Winner Bruce Hornsby in 1990; from 1990 until 1994 Bruce Horsnby supported Plaintiff; Plaintiff obtained a personal manager with Larrakin Management; Gerry Georgettis (who worked with bands such as Pink Floyd) was Plaintiff's personal manager; Georgettis arranged meetings and met with record executives from N.Y. and Los Angeles; from 1992-1995 Plaintiff recorded in State of the Art Music studios. Plaintiff has never been stymied.

e. Fact: (1995-1996) Plaintiff was close to completing his first feature film. From 1994 until 1996 Yeager was editing his first feature film; the film won Best Documentary at the Palm Beach International Film Festival, and won 4-awards at The Dahlonega International Film Festival. Plaintiff has never been stymied.

f. Fact: (1997) Plaintiff was discovered again, this time by John Pierson, who featured Plaintiff's story about the making of his film "Jimmy's Story" on his television show Split Screen. Plaintiff continued filming and editing Part 2 of "Jimmy's Story." Plaintiff has never been stymied.

g. Fact: (1998- 1999) Plaintiff created the nation's first and only on camera film acting class, using real film cameras, sound and lights; Yeager brought actors to real locations, directed the actors, and filmed the scenes; Yeager also wrote the scripts. While students learned how to act specifically for feature film, he also produced "demo-reels" of these scenes; demo reels were given to the students who would use them for auditioning for film castings. Plaintiff has never been stymied.

h. Fact: (2000) Plaintiff produced a film about the famous African American folk artists known as the Florida Highwaymen; Yeager was featured on Fox News as the Florida Highwaymen curator; Yeager spent over 1 year with the artists, and he was considered an expert in distinguishing all 26 artists' paintings by eye; there were many forgeries being sold on eBay, and Yeager was sought out many times to distinguish between fake and real authentic paintings. Plaintiff has never been

stymied.

i. Fact: (2001) Plaintiff was discovered again, this time by Kiss (musical band) and Bon Jovi's personal manager Doc McGhee.

j. Fact: (2002-2004) Plaintiff began production on his second feature film "A Perfect Song"; the film premiered at the Delray Beach International Film Festival in 2004. Yeager won "Best Actor" award. Plaintiff has never been stymied.

k. Fact: (2005) Plaintiff and his wife spent over 4 years devoting themselves to an intense body, mind, and spiritual training regimen; during this time the Yeagers spent many hours a day reading and studying; they were preparing to leave for the desert to make their film "Jesus of Malibu." Plaintiff has never been stymied.

l. Fact: (2008-2011) Plaintiff and his wife spent 3 years making their film; the film was film in many states; a great part of the film was filmed in the desert. Plaintiff has never been stymied.

m. Fact: (2011) Plaintiff and his wife were featured on CNN and Inside Edition when they claimed the "Mysterious Piano," which was a deliberate prank done by an 16 year old from Miami, who placed a burned piano on a sandbar. Plaintiff used the piano as a metaphor and stated on television that the "dilapidated piano was a depiction of the state of humanity, and that man

must change his ways and destiny." Plaintiff has never been stymied.

n. Fact: (2012) Plaintiff and his wife completed their film "Sebastian Beach One Fine Day." The film premiered at NYC Surf Film Festival. Plaintiff has never been stymied.

o. Fact (2013) Production began for "The Film That Changed The World" which is a story about the Yeagers and their mission and desire to change the world, and the making of Jesus of Malibu; the film was produced by Maltese productions. Plaintiff has never been stymied.

p. Fact: (2015) "The Film That Changed The World" premiered at the Red Dirt International Film Festival and won "Most Inspirational" movie award. Plaintiff has never been stymied.

q. Facts: (2016) Production began for the documentary film "Billy Yeager The Ineffable Enigma." The Yeagers were busy writing and producing their theater play, performance art, and the music for their "What 4?" benefit concerts. Plaintiff has never been stymied.

The statement made by Andrew Flanagan, "Yeager has been stymied repeatedly," is false, defamatory and was written with negligence and reckless disregard for the truth.

147. The following published statement is false and defamatory: "Yeager spent two years planning and executing a hoax."

a. Defendant is referring to Plaintiffs' performance art and artistic protest for his film "Jimmy's Story."

b. Evidence provided proves that Jimmy Story is a fictional character that was created for the film "Jimmy's Story." Evidence proves "Jimmy Story" was not a hoax, but a performance art and protest statement created to deliver an important message for society in the film "Jimmy's Story," which won 4 Awards at the Dahlonega International Film Festival.

148. The following published statement is false and defamatory: "to pull off his scam."

a. Scam is defined as fraud and swindle; a swindler is described as someone who has used deception to deprive someone of money or possessions.

Plaintiff has never in his 60 years of life swindled anyone. This statement is extremely defamatory.

149. The following published statement is false and defamatory: "note that many- to most of the clippings included in that image, such as the story from "New York Times" are clearly fake."

Fact: This statement above is most detrimental; the "clippings" that Andrew Flanagan is

mentioning above, are 53 images from published newspapers and magazines. Exhibit H. proves

beyond all doubt that "clippings" are not fake. Public's perception of the Plaintiff and their

comments posted in regards to The Article, prove that NPR did in fact destroy Plaintiff's

reputation, and destroyed the public's trust about Plaintiff and his wife's mission, benefit concerts,

and any charity or humanitarian causes in the future that the Yeagers choose to pursue.

Exhibit Collage. http://exhibitscase.blogspot.com/2018/03/exhibit_5.html

150. The following published statement is false and defamatory: "Hornsby heard a demo tape of

Yeager's" - "It was the closest he would come to fame, but it cemented in Yeager's mind that he'd

thought for some time: that he was destined for, or perhaps owed greatness."

Fact: How can a journalist conclude what was in Plaintiff's mind over 23 years ago? How does

another party know what "cements" in another's mind? How does another party know what

someone else "thought for some time"? Are we not taught to not "judge"?  No one is owed

anything in life, not even the air we breath, it is a gift. Plaintiff has come close to fame many,

many times throughout his life, and in all occasions, Plaintiff was guided by the spirit of truth to

chose another path. My destiny was not chosen by myself, my destiny was given to myself long

ago, that destiny is the same as everyone's destiny, to seek beauty, simplicity and good virtues,

and make a difference in the world and help those less fortunate. One only need to hear that call.

Plaintiff has always despised fame, unless it is used for raising awareness for humanitarian

reasons; Plaintiff has never thought he was owed anything, Plaintiff has always known his

purpose to help his fellow man and that includes enlightening those who are blinded and have lost

direction and purpose in their lives. And greatness is in serving, not entertaining and earning

money. Plaintiff has always been a servant but not to a world of vanities, but a servant to the spirit

of Truth. My mind is cemented not in this world, but where moth does not destroy; man's lesson

in life, and his destiny, is to rid himself of all desires and vanities. Defendant's statements are

grossly false and defamatory.

151. The following published statement is false and defamatory: "The catalyst Hornsby provided

would become a source of obsession."

Fact: A catalyst is defined as a "stimulus"; the stimulus that Bruce Hornsby provided was

inspiration, not a source of obsession. Flanagan's "source of obsession" was used in an extremely

condescending and disrespectful manner and was chosen and written with malice. Obsession is

defined as "passion," and it can be used in a positive manner, or a negative manner; my "passion"

is to help those who are suffering, and to raise awareness about the injustice that exists throughout

the world.

152. There are millions of musicians that fall through the cracks. A total unknown (Plaintiff) was

sitting in his apartment writing and recording music for over 6 years, every day, when Grammy

Award Winner Bruce Hornsby (who is considered by most all respected musicians to be one of

America's great cultural treasures) took the time to help Plaintiff, at the height of his career (which is generous, and unprecedented, and speaks volumes about his character); the fact is, Plaintiff was extremely grateful, and "The catalyst that Hornsby provided" was not a source of obsession, but inspiration and also encouragement, support, guidance, advice and contacts, including his personal manager and the record companies.

a) Plaintiff was never obsessed with anything other than using his talents to help those who cannot help themselves, raising conscious awareness, becoming truth, and standing on the pillar of truth blasting a trumpet that calls all people to repent of their vanities and stupidities, and choose the narrow, difficult path, one where the people may throw stones; but they will never kill Truth.

153. The following published statement is false and defamatory: "A tumble down the rabbit hole of Yeager's life is quixotic indeed - relentless failures and his ceaseless drive to reverse them form a closed loop that only occasionally reaches out into the real world."

a) Relentless failures, has been proven false, "real world" has been covered previously.

154. The following published statement is false and defamatory: "But the release of "Jimmy's Story," which Stacey praised, drew the attention of a Spanish woman named Anais, who traveled to Florida and became Yeager's wife."

Defendant alleges that Plaintiff's wife traveled to Florida to be married to a fraud and a scoundrel by making reference to Jimmy Story, which Defendant presents in the Article as nothing more than a "hoax" and a "scam."

155. Anais was quoted in the publication The Howler (located in Costa Rica), stating that she had in fact came to the U.S. because: "We committed our lives to this film and our desire to change the world with our talents that day." It is most pertinent to the case to read carefully the exhibit below, to clearly see the malicious bias agenda Andrew Flanagan had, intending to not only harm Plaintiff, but his wife. It should also be noted that this information came from Andrew Flanagan's source, that had not seen or spoken to Plaintiff in over 17 years.

Exhibit H 155 http://exhibitscase.blogspot.com/2018/03/exhibit.html

156. The following published statement is false and defamatory: "For all his purported virtuosity and the ostensible existence of multiple recordings, his music is- besides grainy footage of Yeager shredding, tank-topped and beach browned, in a backyard jam session- practically inaccessible in an age of ubiquitous access."

Defendant claims that there are no videos other than "grainy footage" of a jam session, when there were in fact 8 other videos that featured Plaintiff's music. Defendant purposely tried to bury

the facts because Plaintiff's humanitarian message and style of music videos was not in alignment

with his malicious agenda. Defendant's reckless disregard for the truth proves his agenda and

malice.

Exhibit. http://newyorksurffilmfestival.com/2012-feature-films/sebastian-beach-one-fine-day


157.  The following published statement is false and defamatory: "The story of Billy Yeager is

one of purposeless obfuscation."


Defendant makes clear defamatory remarks, stating that Plaintiff has no purpose in his life, other

than obfuscate; meaning the art Plaintiff creates, music, films and performance art "obscure life,"

"make things unclear" and "unintelligible" (Websters definition of obfuscation.) Purposeless,

means no purpose.


Exhibits below indicate Plaintiff has a purpose and mission and is not unintelligible.


Exhibit L. https://www.youtube.com/watch?v=UVxF2-aCT7I


158. The following published statement is false and defamatory: "Yeager for all the belief he has

in his promise and his failures expressing it, has repeatedly poured more of his creative energy

into being a trickster-booster that he has an artist."

This statement above, caused Plaintiff to lose complete credibility as an artist, musician, filmmaker, performance artist, activist and humanitarian. Plaintiff has, for the last 40 years of his life, poured his creative energies into his work as an artist. For the past 13 years, together with his wife, Plaintiff has been pouring creative energies into making a difference in the world. Plaintiff spent 3 of those years in the desert, writing, producing, directing, and acting in his film, a film that was created to raise conscious awareness.

159. Plaintiff will provide factual evidence and testimony (from many people who will testify in court) that will prove beyond any doubt the falsity of all the statements above, and will demonstrate with clarity and certainty that all of the statements were written with extreme bias against Plaintiff, negligence, exercising reckless disregard for the truth, and with malice.

160. There is no question that NPR's Article is extremely biased and written with negligence and malicious intentions, exercising a high degree of disregard for the truth. Also Defendant refused to contact any of the people that had watched the film about Plaintiff whose positive comments were posted below the trailer on Vimeo Pro, and were clearly visible.

161. This is NPR's Mission:

a. To tell the truest story possible, it is essential that we treat those we interview and report on with scrupulous fairness, guided by a spirit of professionalism. We make every effort to gather responses from those who are the subjects of criticism, unfavorable allegations or other negative

assertions in our stories.

b. Our challenge is not to be dependent on what any particular source tells us, but to have enough mastery of our subject that we can accurately situate each source's knowledge and perspective within a broader context. This means we strive to know enough about a subject that we can tell when a source is advocating a disputed position, advancing a vested interest or making a faulty claim.

c. Hearing from a variety of people makes our journalism stronger and more complete. In our reporting, we seek various perspectives on an issue, as well as the evidence supporting or countering each one.

d. We avoid hyperbole and sensational conjecture.

e. The public deserves factual reporting and informed analysis without our opinions influencing what they hear or see. So we strive to report and produce stories that transcend our biases and treat all views fairly. We aggressively challenge our own perspectives and pursue a diverse range of others, aiming always to present the truth as completely as we can tell it.

f. Everyone affected by our journalism deserves to be treated with decency and compassion. We are civil in our actions and words, avoiding arrogance and hubris.

g. We minimize undue harm and take special care with those who are vulnerable or suffering.

h. Engaging, clear and genuinely human storytelling is a hallmark of NPR journalism. But our audience's perceptions of what we report can be influenced not only by the information we present but also by how we present it.

NPR ignored all these statements ( a to h ).

162. NPR's statement: "We are civil in our actions and words" is hypocritical; Plaintiff was depicted as  Embittered, Hoaxster, Scammer, Bamboozle, Stymied Repeatedly, Fake, Relentless Failure, Trickster-Booster, Charlatan - Huckster, Purposeless Obfuscation, Motivated by a Force of Hunger for Fame and Infamy.

 163. NPR's statement: "To tell the truest story possible, it is essential that we treat those we interview and report on with scrupulous fairness, guided by a spirit of professionalism" is another appalling hypocritical statement; not one truth was told, that is why Plaintiff repeatedly stated, reinstated and demanded that "the entire Article be removed."

164. NPR published: "Eventually, Yeager began experimenting with the web and the infinite possibilities it offers, to those with ample time on their hands, for invention, obfuscation, and

most importantly, self mythology."

165. This derogatory, defamatory, malicious statement is being addressed last. Defendant is basically trying to make readers believe Plaintiff does nothing in his life; Plaintiff doesn't write and record music; Plaintiff doesn't produce meaningful films or music videos; Plaintiff doesn't produce content except to "invent" obscure mythical non-sense; Plaintiff didn't spend the last year working on the Benefit Charity concerts; Plaintiff just sits in a "cramped apartment," and spends all of his time (which is ample) on the internet "inventing, using the infinite possibilities that it offers" to waste my life away.

166. This defamatory remark "having ample time on your hands" is defined as: "dawdle, dilly-dally, idleness, inactivity, indolence, interim, interlude, intermission, laze, lazing, lazy, leisure, letup, loaf, loafin." With no proof NPR's Andrew Flanagan had the audacity to make such a statement. This sentence proves malice.

167. FIRST CAUSE OF ACTION

Defamation: for statements published on March 23, 2017 by NPR ONLINE (WEBSITE) read all over the world.

Plaintiff repeats and re-alleges each of the foregoing paragraphs1- 166, as if set forth fully herein.

168. SECOND CAUSE OF ACTION

Slander (defamation) for words stated on NPR's "All Things Considered" broadcast on the

airwaves, heard by millions, in the USA and abroad.

Plaintiff repeats and re-alleges each of the foregoing paragraphs 1-166, as if set forth fully herein.

169. THIRD CAUSE OF ACTION

Defamation: Printed transcription (online) of NPR's "All Things Considered" broadcast.

Plaintiff repeats and re-alleges each of the foregoing paragraphs 1-166, as if set forth fully herein.

170. FOURTH  CAUSE OF ACTION

Defamatory Article shared online on NPR's social media platforms. NPR FACEBOOK: 5,924,709

following. NPR Twitter 7.3 million following. NPR All things Considered Twitter 264,000

following.

Plaintiff repeats and re-alleges each of the foregoing paragraphs 1-166, as if set forth fully herein.

171. FIFTH CAUSE OF ACTION

Defamatory Slanderous NPR Broadcast shared on NPR's social media platforms. NPR

FACEBOOK: 5,924,709 following. NPR Twitter 7.3 million following. NPR All things

Considered Twitter 264,000 following.

Plaintiff repeats and re-alleges each of the foregoing paragraphs 1-166, as if set forth fully herein.

172. NPR stated on the airwaves that Plaintiff is a charlatan; NPR published libelous statements

in The Article that stated Plaintiff invested all of his time and energy into being a trickster (cheat,

fraud, fraudster, mountebank, impostor, villain, shyster, scoundrel) rather than as an artist, and

that Plaintiff had no purpose in life other than "obfuscation." NPR stated that Plaintiff was an

embittered bamboozler and manipulated their audience into believing Plaintiff had no talent, and

was a failure, obsessed with fame and infamy. NPR manipulated their readers into believing that

there was no music of Plaintiff available other than grainy footage of Plaintiff playing guitar at a

backyard party 30 years ago; NPR stated that Plaintiff's film was roughshod and chaotic. NPR

stated over 41 derogatory and defamatory descriptions, which incited many negative comments

from readers. Not only the benefit concerts had to be cancelled, but the readers were made to

believe that the limited editions of Plaintiff's music and films that had just been released about

Plaintiff were a scam.

Exhibit 172 Damages http://exhibitscase.blogspot.com/2018/03/exhibit_92.html

173. With the world reading and hearing these descriptions and comments about myself being a scoundrel, bamboozler, and scammer, including the people in my small town where I live, and considering the fact that NPR is such a well known established institution and is considered to be a professional source where one can obtain news, I have no choice but to defend my reputation. My wife and myself have chosen an extremely difficult path, a narrow road. Ours is not a "popular message," we don't have millions of supporters, we don't even have thousands, we don't even have hundreds, yet I dedicate and pour my spirit and soul into something that I feel compelled to do for humanity.

174. Evidence of special loss.

Consider: Weighing the serious level of gravity, of the over 41 - defamatory and malicious statements, descriptions and remarks, the complete bias (by omission, selection, spin) against Plaintiff, negligence, reckless disregard for the truth and agenda of the Defendant Andrew Flanagan, the slander broadcasted around the world on NPR's Radio Broadcast (Charlatan, Huckster), malicious innuendoes, false unverified information published, distortion of truth, purposely made inaccuracies and exaggerations, irrelevant sources and lack of sources, fabrication of false defamatory information, refusal to contact sources that were expressing positive things about Plaintiff on film trailers and comments on videos, refusal of using positive information from the many articles online, refusal to inform the public about positive factual

information (info was hidden from the public), refusal of guiding readers with no mention of, or links to Plaintiff's work, music videos, and documentaries made about Plaintiff and his work, false light (manipulating audience away from the truth), the legal department's refusal to remove The Article, corresponding with double speak, contradicting and abandoning their own code of ethics in NPR's handbooks, lying, deceiving the public and destroying the reputation of Plaintiff and his wife, bias by labeling Plaintiff a fraud, destroying 100% of the trust of the public in Plaintiff's humanitarian work, destroying 100% trust from the people who worked with Plaintiff many years ago, that had lost touch, destroying Plaintiff's chance to earn a living, emotional distress and suffering, months of depression due to destroying Plaintiff's Benefit Charity concerts and humanitarian efforts; these are all relevant things to assess the quantum of damages necessary to vindicate the Plaintiff.


175. When assessing damages, I also believe that it is only right to consider analyzing the complete picture.

When Plaintiff met his wife 12 years ago, since day one we began to commit ourselves to a mission and a vision. These statements were in fact our "wedding day vows." For over 12 years we have never wavered from our mission; with no help, funding, backers, investors, it has been a long hard road trying to get our message out to the world. After 12 years we were finally close to being able to perform somewhere; considering the historical and interesting location of the underground missile base, a film screening, music, theater play, that included actors, a full 16 piece professional band, there was a lot of potential to receive publicity and to make this dream a

reality.

176. But this is not the only serious damages. The other damages that should be considered severe, is the 100's of thousands, or we could even say 100 million people who still do not own their own wheelchair in 3rd world countries. Low cost manufactured wheelchairs made from plastic lawn chairs and bicycle wheels is what is being given to these people across the world. For those who don't have them, they must crawl on the ground. Children in these countries sometimes must earn a living to take care of their injured parents, who were hired by contractors to do the extremely dangerous job of removing underground bombs that explode everyday. Some of these children lose their arms, legs, and sometimes both - it is documented that there are children who still re-detonate bombs while crawling on the ground, doing it with their mouths. Because of the seriousness of this extremely biased negative article, nobody from now on will want to associate themselves with myself because when conducting a background check about myself they will find NPR's Article which depicts me as  a scammer and a fraud. How much money can repair the damages, what is something such as this worth? Realize that everyday that goes by, every week that goes by (and there have been over 11 months and counting), my work as an artist to help others has been stifled by NPR, Andrew Flanagan, Jacob Ganz, and NPR's legal team and their superiors.

Plea

177. The Defendant's defamatory story, suffused with extreme bias, hidden agendas, malicious

intent; the humiliation and suffering caused to Plaintiff, and the permanent damage caused to his

work and reputation must all be taken into account when awarding damages. The court should

consider not only what the Plaintiff should receive, but also what the Defendant should pay as

punitive damages to deter others from engaging in conduct similar to that which formed the basis

of this lawsuit.

178. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment, jointly and

severally, against Defendants, awarding Plaintiff compensatory damages in an amount not less

than $ 100 Million ($ 100,000,000.00) and punitive damages to punish and deter Defendants in an

amount not less than $ 150 Million ($ 150,000,000.00) and granting such other and further legal

or equitable relief deemed appropriate.

179. Plaintiff respectfully requests that this Court also awards Plaintiff for aggravated damages,

for the egregious conduct of the Defendant Ashley Messenger, CEO Jarl Mohn, and the members

of the Board of Directors (who supposedly had been made aware), who were responsible for

increasing the pain and suffering of Plaintiff by ignoring Plaintiff's request to remove article, and

forcing Plaintiff to spend weeks and months providing information to defend his reputation;

Plaintiff shared an immense amount of evidence which proved his true character, his long career

and hard work, his purpose and mission as an artist, the meaning and purpose of his work, and

also proved Plaintiff's reputation had been ruined; Plaintiff also provided interviews and

testimony from people who spoke on camera about the Plaintiff, his wife and their work (1 hour 3

minutes long), charity organization emails were forwarded, articles and videos were provided.

Minister Tim Lytle from Unity Church in Wichita also called Messenger personally, providing

proof that Plaintiff and his wife were not charlatans, frauds, and swindlers, but spiritually driven

artists, activists and humanitarians. The Defendants' conduct was devoid of respect, empathy,

compassion, ethics; not one person called or said they were sorry; Plaintiff only received

condescending emails full of deceit.


180. When Plaintiff called Messenger, but instead reached her assistant, Plaintiff spoke briefly

with the assistant explaining the situation and how this article had destroyed Plaintiff's life,

reputation and mission; Plaintiff asked the assistant, "What would you do, wouldn't you sue if you

were in my shoes?" To which the assistant said, "No." Plaintiff asked the assistant "Why?" The

assistant answered in a very condescending manner and said, "Because you will lose," stated

matter of fact, with arrogance and complete lack of empathy and compassion.


Punitive damages, it is stated, has two purposes: to punish a wrongdoer for bad behavior and to

deter others from behaving in a similar manner; consider the arrogance, the insensitivity, and the

vile behavior from all those involved, and then consider not only punitive damages, but

aggravated damages.

181. Plaintiff respectfully requests that this Court also consider 'special damages' and the people (the Public) who contribute money and help fund NPR (National Public Radio), who expect fairness, honesty, integrity, and unbiased truth for their donations. Consider these "contributions" and hard earned money that for years has been used to support NPR; consider the carelessness, dishonesty, and the thievery of trust; consider the unfathomable "Promotion and Pay Raise" that NPR just recently gave the Defendant Andrew Flanagan who was highly responsible for the defamation, humiliation, pain and suffering caused to Plaintiff, and for destroying Plaintiff's reputation; consider the 30,374,797.00 in contributions for 2016, and consider the 60,055,147.00 from the demutualizationalised facadical "Public Radio" Corporate Sponsorshipped NPR, and consider awarding special damages in the amount of another 100 million dollars ($100,000,000.00) to be taken from the corporately funded NPR, and given back to the people, to be funneled to a Charity cause by Plaintiff.


182. In closing, your Honour, if the Declaration of Independence rightly gives each one of us American citizens the Unalienable Rights of "Life, Liberty and the pursuit of Happiness," and also states these rights were given to all human beings by their Creator, so as to protect this pursuit of Happiness, let me state that this "Life," "Liberty" and "Happiness" have been taken away from Plaintiff by NPR (National Public Radio).


183. Because of being labeled as a fraud, scammer, trickster, charlatan, huckster, my "Life" of purpose has been destroyed; my "Liberty" to be able to help others as a filmmaker, musician, activist and humanitarian has been imprisoned and taken away; and my "Happiness" has been terminated and is forever gone, because my desire was not just to survive as a self centered being, but to "change the world."

184. Your Honour, can there truly be "Happiness" while others suffer and injustice prevails? Can there BE Liberty? Not only on the land, but in our hearts, if we can't free the slaves, and our brothers, and to heed their call? And lastly, can there be "Life" when others around the world are unfairly treated and served with injustice, who have no life and are left hopeless and sad; with no chance to fight to bring others Happiness, why not better to die?

There is so much tragedy in the world, how can I simply choose a life of entertaining people into complacency, have we not been amused to death long enough by the media and entertainment industry? If there be justice, if there be righteousness, if there be goodness, let it rein in our Legal System, let a man stand or fall, but let a man be free to choose to defend his "honor," your Honour, pro-se, and may this servant be given this right back again, to Live and be Happy, as an artist / humanitarian, bringing this "Life, Liberty and Happiness" to All the world and its people. Amen

Plaintiff demands a trial by jury on all issues in this case

.
Respectfully submitted

William Yeager

sign

William Yeager prose

PO BOX 42
COTTONWOOD FALLS, KS
66845